CONSEJO DE TITULARES DEL CONDOMINIO ORQUÍDEAS A, B y C, ETC., demandantes, *v.* CORPORACIÓN DE RENOVACIÓN URBANA y VIVIENDA, ETC., demandados y recurrentes, SHELLEY CONSTRUCTION COMPANY, INC., NATIONAL INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA y HAMPTON DEVELOPMENT CORPORATION, demandados contra coparte y recurridos, y BAHARIAN INVESTMENT COMPANY, S.W. INDUSTRIAL, INC., SHEFA, INC., SHELLEY W. SHELLEY y DANIEL W. SHELLEY, demandados contra terceros y recurridos.

*Número:* RE-87-297 *Resuelto:* 16 de febrero de 1993

710

*Jesús Rabell Méndez* y *Alejandrina Rivera Vicente*, de *Cancio, Nadal & Rivera*, abogados de los demandados y recurrentes; *Antonio Montalvo Nazario*, abogado de la recurrida National Insurance Company; *José Luis Novas Dueño*, abogado de S.W. Industrial, Inc., Shelley W. Shelley y Daniel W. Shelley, recurridos; *José B. Díaz Asencio*, del *Bufete Vicente Zayas Puig*, abogado de Hampton Development Corporation, recurrida.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

Hoy nos corresponde resolver si una causa de acción por sufrimientos y angustias mentales sufridos por unos demandantes, ejercitada en tiempo, puede ser transmisible por cesión como crédito litigioso.([1])

---

([1]) Debemos aclarar que los recurrentes originales en este caso eran la Corporación de Renovación Urbana y Vivienda (C.R.U.V.) y el Banco de la Vivienda (el Banco). Debido a la difícil situación económica que atravesaba la C.R.U.V., recientemente se aprobó legislación para disolver dicha corporación pública. Según indicamos en *Pagán et al. v. E.L.A. et al.*, 131 D.P.R. 795 (1992), en virtud de la Ley Núm. 55 de 9 de agosto de 1991 (17 L.P.R.A. sec. 27) se disolvió la C.R.U.V. y se ordenó que se liquidasen todos sus activos, de manera que con el producto de esa liquidación se pudiesen atender sus obligaciones financieras.

A la vez, la Ley Núm. 55, *supra*, creó la Oficina para la Liquidación de las Cuentas de la C.R.U.V. Dicha oficina compareció ante nos para solicitar ser sustituida como parte recurrente en este pleito en lugar de la C.R.U.V., para así cumplir con lo dispuesto en el Art. 11 de la referida ley que, en lo pertinente, lee como sigue:

"Ningún pleito, acción o procedimiento entablado de acuerdo con [la ley], por o contra la Corporación o contra cualquiera de los funcionarios o empleados de esa instrumentalidad, en su carácter oficial o en relación con el desempeño de sus deberes oficiales será desestimado por el solo fundamento de la aprobación de [esta ley]. El Tribunal, a moción de parte interesada o mediante alegación adecuada, presentada en cualquier fecha dentro de los doce (12) meses siguientes a la fecha de vigencia de esta ley que demuestre, a satisfacción del Tribunal, la necesidad de la continuación de dicho pleito, acción u otro procedimiento para resolver las cuestiones

# I

## *Exposición de los hechos*

Los Consejos de Titulares constituidos por residentes de los edificios A, B y C del Condominio Orquídeas entablaron una demanda en contra de la Corporación de Renovación Urbana y Vivienda (C.R.U.V.), el Banco de la Vivienda (el Banco), Shelley Construction Company (Shelley), Hampton Development Corporation (Hampton) y las compañías aseguradoras de éstas dos (2) últimas: la National Insurance Company y la Insurance Company of North America. Reclamaron el cumplimiento específico y daños y perjuicios por vicios de construcción. Alegaron que los vicios de construcción del Condominio Orquídeas causaron la ruina a los edificios durante el período de diez (10) años inmediatos a la terminación y entrega de la construcción.[2]

En 1985 la C.R.U.V. presentó una demanda contra coparte en contra de las codemandadas Shelley, Hampton y sus aseguradoras, y demanda en cuanto a terceros contra Baharian Investment Company, Ltd.; S.W. Industrial, Inc.; Shefa, Inc.; Shelley Equipment and Finance Corp.; Shelley W. Shelley, y Daniel W. Shelley.[3] Esta demanda fue enmendada en 1986. En la demanda enmendada de coparte y en cuanto a terceros, los peticionarios C.R.U.V. y el Banco comparecieron como cesionarios de la causa de acción de un exceso de sesenta y cinco (65) titulares del Condominio Orquídeas A, B y C. Alegaron que los demandados contra coparte le eran responsables directamente a los demandantes originales, es decir, al Consejo de Titulares del Con-

---

envueltas, podrá permitir que el mismo prosiga por o contra la Oficina creada por [esta ley] para liquidar los activos y pasivos de la Corporación." 17 L.P.R.A. sec. 27(j).

Mediante resolución, concedimos la sustitución solicitada.

[2] La cuarta demanda enmendada data de 1982.

[3] Originalmente, el tribunal de instancia no permitió la demanda contra coparte y en cuanto a terceros. La C.R.U.V. acudió en *certiorari* ante nos y este Tribunal autorizó la presentación de la demanda.

dominio Orquídeas A, B y C, de las reclamaciones alegadas en la demanda original. También alegaron que los terceros demandados le eran responsables directamente a los demandantes o a la C.R.U.V. por la totalidad de la reclamación formulada en contra de la C.R.U.V.

La cesión hecha por los demandantes a la C.R.U.V. y al Banco se efectuó mediante estipulación firmada por las partes. Esta estipulación fue sometida al tribunal el día 1ro de julio de 1985. Conforme al párrafo quinto de la estipulación, las partes acordaron que la C.R.U.V. y el Banco adquirirían todas las causas de acción de los condóminos contra los otros codemandados, Hampton, Shelley y sus aseguradoras, a cambio de la entrega y el traspaso legal a los demandantes de un apartamento en el Condominio Villa Panamericana, o pago en efectivo, según fuera el caso, o una combinación de ambas cosas. La C.R.U.V. también acordó cancelar la hipoteca que tenía sobre los apartamentos de los demandantes sin cargo ni penalidad de tipo alguno.

Esta cesión se realizó mediante contrato de transacción, tal y como lo indica el párrafo tercero de la estipulación:

> Que debido a que LA PRIMERA PARTE [C.R.U.V. y el Banco] entiende que la situación surgida en los Condominios Orquídeas es responsabilidad de terceros, demandados también en los casos de epígrafe, y dada su responsabilidad social y legal de resolver de inmediato el problema a LA SEGUNDA PARTE [los condóminos], interesa y por este medio llega a esta transacción y en consideración a lo acordado en la misma, adquiere la causa de acción que tiene LA SEGUNDA PARTE contra dichos terceros por los vicios de construcción de los apartamientos y áreas comunales de dichos condominios y/o edificios.

Los condóminos, a su vez, en consideración a las prestaciones recibidas de la C.R.U.V. y el Banco, se comprometieron a ser sus testigos en el juicio en su fondo de este caso, de así solicitárselo las cesionarias, y también les cedieron sus derechos sobre los informes periciales preparados

hasta ese momento. En el párrafo décimo de la estipulación se especifica que se pacta la cesión de las causas de acción por daños y perjuicios:

> Siendo la causa de acción transmisible de acuerdo a lo dispuesto en el Artículo 1065 del Código Civil de Puerto Rico (Ed. de 1930), se pacta por LAS PARTES el que LA SEGUNDA PARTE cede a LA PRIMERA PARTE todos sus derechos, acciones, causas de acción por daños y perjuicios, vicios de construcción, etc. y gastos incurridos todo ello tanto en cuanto a su apartamento individual como en cuanto a su participación en los elementos comunes del Condominio, todo ello sin reserva o limitación de tipo alguno e incluyendo su disponibilidad para testificar para LA PRIMERA PARTE en la continuación del pleito y relativo a su causa o causas de acción.

La aseguradora National Insurance Company, una de las demandadas de coparte, presentó una moción para solicitar se desestimase la causa de acción referente a sufrimientos y angustias mentales en las causas de acción cedidas a la C.R.U.V. y al Banco por los alegados vicios de construcción del Condominio Orquídeas A, B y C. La C.R.U.V. y el Banco se opusieron. Así las cosas, el foro de instancia dictó una sentencia parcial en la que desestimó la causa de acción por sufrimientos y angustias mentales que fuera adquirida por la C.R.U.V. mediante cesión. Concluyó el tribunal que los sufrimientos y las angustias mentales constituían un derecho personalísimo cuya cesión no está sujeta al comercio de los hombres. Además, añadió que "[d]icha transmisión e[ra] contraria a la moral y al orden público. La causa de acción por sufrimientos y angustias mentales está tan ligada a la persona que de sostenerse la cesión desvirtuaría la naturaleza de la misma".

Las peticionarias C.R.U.V. y el Banco acuden ante nos para que dejemos sin efecto dicha sentencia parcial. Como único error, las peticionarias apuntan que:

> Erró el Tribunal de Instancia al desestimar la causa de acción por sufrimientos y angustias mentales sufridos por los re-

sidentes del Condominio Orquídeas, ejercitada en tiempo y cedida a la CRUV y al Banco como crédito litigioso de una acción interpuesta por dichos residentes.

## II

*La cesión de crédito*

### A. *Principios generales*

■ En *IBEC v. Banco Comercial*, 117 D.P.R. 371 (1986), tuvimos la oportunidad de examinar la figura de la cesión de crédito en nuestro ordenamiento jurídico. Allí dijimos que ésta ha sido descrita como " 'un negocio jurídico celebrado por el acreedor cedente con otra persona, cesionario, por virtud del cual aquél transmite a éste la titularidad del derecho de "crédito cedido" '. L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. 1, pág. 789". Íd., pág. 376.

■ Con respecto a la cesión de crédito, también indicamos allí:

> El cesionario se instala en la misma posición y relación obligatoria con respecto al deudor a partir de la transmisión del crédito. Es una transmisión del crédito que hace el acreedor o cedente al cesionario por un acto ínter vivos que cumple una función económica de mucha importancia y utilidad en la economía moderna. La figura viabiliza la circulación de los créditos en el comercio y es de particular utilidad en el sistema bancario moderno. Díez-Picazo, *op. cit.*, pág. 789.
> Para que la enajenación del crédito a través de una cesión tenga validez, tiene que existir un crédito transmisible fundado en un título válido y eficaz. Es indispensable que sea un crédito existente que tenga su origen en una obligación que sea válida y eficaz. Díez-Picazo, *op. cit.*, pág. 791. *IBEC v. Banco Comercial*, supra, págs. 376–377.

■ Si bien el cesionario se convierte en el nuevo acreedor, al deudor que ignora la cesión le cobija la protección de la ley puesto que queda liberado si, desconociendo

la cesión, satisface la deuda al acreedor original. Art. 1417 del Código Civil, 31 L.P.R.A. sec. 3942. Es necesario, pues, que la fecha de la cesión conste por modo auténtico y que se notifique de la cesión al deudor.(⁴) Luego de notificada la cesión a éste, la deuda sólo puede extinguirse mediante el pago al cesionario. "El cambio de acreedor no empeora la situación del deudor y no lo priva de las reclamaciones que tenía frente al cedente a menos que haya consentido." *IBEC v. Banco Comercial,* supra, pág. 377.

B. *Transmisibilidad de los créditos*

■ Como ya mencionamos, la cesión permite al acreedor o cedente transmitir su crédito al cesionario. Es un principio general del Derecho la transmisibilidad de todos los derechos adquiridos en virtud de una obligación. El Art. 1065 del Código Civil recoge este principio: "Todos los derechos adquiridos en virtud de una obligación son transmisibles con sujeción a las leyes, si no se hubiese pactado lo contrario." 31 L.P.R.A. sec. 3029. Se incluyen, pues, todos los derechos de crédito.

■ Hay que reconocer, sin embargo, que este principio no es absoluto, "sino que tiene algunas limitaciones surgidas unas veces por las peculiares características del crédito como bien dentro del comercio, y otras, por la necesidad de que la transmisión no sea perturbadora de los principios básicos que han de informar las relaciones jurídicas privadas". J.L. Navarro Pérez, *La cesión de créditos en el Derecho Civil español,* Granada, Ed. Comares, 1988, pág. 67.

Nuestro Art. 1065, *supra*, proviene del Art. 1112 del Código Civil español. En vista de que la transmisibilidad de los derechos de crédito se trata de un principio general,

---

(⁴) "La cesión de un crédito, derecho o acción no surtirá efecto contra tercero sino desde que su fecha deba tenerse por cierta en conformidad a las secs. 3273 y 3282 de este título." 31 L.P.R.A. sec. 3941.

cabe preguntarse, entonces, cuál fue la necesidad que tuvo el legislador español de sancionar esa transmisibilidad. Ante esa interrogante, Manuel García Amigó nos responde lo siguiente:

> Sencillamente, porque en la historia de nuestro Derecho se negaba esa posibilidad; nuestras Partidas, al igual que hacía el Derecho romano, negaban esa cualidad de las relaciones jurídicas obligacionales, no sólo desde la titularidad pasiva, sino también desde la activa, no sólo las deudas, sino también los créditos eran intransmisibles. Véase el comentario al Art. 1112, escrito por Manuel García Amigó, que aparece en C. Paz-Ares Rodríguez y otros, *Comentario del Código Civil*, Madrid, Secretaría General Técnica, Centro de Publicaciones, 1991, T. II, págs. 71–72.

Los vestigios de estas concepciones provenientes de las Partidas y de los juristas de Roma quedaron borrados con el Código Napoleónico, el cual contenía "la figura de la cesión de créditos y de la subrogación por pago —introducida ésta por el uso y la práctica de los negocios: así lo recuerda Doumoulin". Paz-Ares, *op. cit.*, pág. 72. Con el propósito de poner fin a las repercusiones que todavía tenían las ideas romanísticas en las universidades y en la judicatura a la altura del siglo XIX, el legislador español entendió conveniente aclarar la cuestión de la transmisibilidad de los derechos de crédito.([5])

C. *Los derechos personalísimos son intransmisibles*

▇▇▇ Pasemos, pues, a considerar las excepciones al principio general de la transmisibilidad de los créditos. Algunos tratadistas dividen los casos de incedibilidad en tres (3) categorías: por razón de haberse concertado pacto de

---

([5]) Sobre esa base, el tratadista García Amigó indica que esa razón histórica ya no existe y "por ello nos parece el Artículo 1112 [correspondiente al Art. 1065 nuestro] un precepto perfectamente inútil; quizá por considerarlo inútil, el Código de Napoleón prescindió de él". Véase el comentario al Art. 1112, escrito por Manuel García Amigó, que aparece en C. Paz-Ares Rodríguez y otros, *Comentario del Código Civil*, Madrid, Secretaría General Técnica, Centro de Publicaciones, 1991, T. II, pág. 72.

incedibilidad, por prohibición legal y por la propia naturaleza del crédito. Las primeras dos (2) categorías se derivan del propio texto del Art. 1065. En cuanto a la tercera razón de incedibilidad, se trata de "una deducción obvia del carácter estrictamente personal del crédito, o de su accesoriedad, que le haga depender en su existencia y transmisibilidad de otro principal". Navarro Pérez, *op. cit.*, págs. 67–68. Véase J. Castán Tobeñas, *Derecho civil español, común y foral*, 15ta ed., Madrid, Ed. Reus, 1988, T. 3, pág. 343. En esta última categoría se encuentran los derechos denominados personalísimos.

▆▆▆ Los derechos personalísimos se caracterizan por su intransmisibilidad.[6] Debido a que necesitan de la vida natural de la persona para continuar ejercitándose, desaparecen con la muerte de su titular.

> En ese caso se encuentra el usufructo, el uso y la habitación, la renta vitalicia que estuviere disfrutando el finado, la patria potestad, los alimentos, la tutela, las servidumbres personales y, en general, todos los derechos personalísimos, pues todos ellos se extinguen por el hecho del fallecimiento, y no se transmiten a los herederos y sucesores, aun cuando en vida del causante formaran parte de su patrimonio. J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, 7ma ed., Madrid, Ed. Reus, 1972, T. V, pág. 419.

A manera de ejemplo consideremos los derechos de uso y habitación. Se dice que éstos son personalísimos "por estar concebidos en atención de las necesidades de sus titulares y de la familia de éstos". J.R. Vélez Torres, *Curso de Derecho Civil*, Madrid, Offigraff, 1983, T. II, pág. 353. Estos derechos no se pueden arrendar ni traspasar a otras personas por ninguna clase de título. Art. 456 del Código Civil,

---

[6] Tengamos presente que la Ley Hipotecaria y del Registro de la Propiedad dispone que será inscribible en el Registro de la Propiedad la transmisión o gravamen de ciertos derechos siempre que no se hayan constituido como personalísimos. Véase Art. 38(5to) de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2201(5to).

31 L.P.R.A. sec. 1596. El uso y la habitación no son hipotecables por prohibición expresa del Art. 159 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2555. Según Castán, "[l]as facultades del usuario y habitacionista se desenvuelven, pues, exclusivamente dentro del derecho de goce". Castán Tobeñas, *op. cit.*, T. II, Vol. II, 1983, pág. 84.([7])

El derecho personalísimo por excelencia es el derecho a los alimentos:

> La obligación alimenticia "tiene su fundamento en el *derecho a la vida* configurado como un derecho de la personalidad". (Énfasis y comillas en el original). P. Beltrán de Heredia, *La obligación legal de alimentos entre parientes*, Salamanca, Ed. Anaya, 1958, pág. 33. *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61, 72 (1987).

■ Este derecho "no es transmisible de ninguna manera, haya o no pacto en contra". Q.M. Scaevola, *Código Civil*, 2da ed., Madrid, Ed. Reus, 1957, T. XIX, pág. 707. Si bien el derecho a los alimentos no es transmisible a un tercero, es decir, que el derecho no podrá ser objeto de tráfico jurídico, las pensiones ya vencidas pueden cederse. Hemos citado con aprobación lo expuesto por el tratadista José Luis Lacruz Berdejo en el sentido de que " 'el derecho a las pensiones vencidas o a la indemnización por las prestaciones incumplidas constituye un crédito corriente y negociable' ". (Énfasis suprimido.) *Martínez v. Rivera Hernández*, 116 D.P.R. 164, 169 (1985). Véase *Rubio Sacarello v. Roig*, 84 D.P.R. 344, 357 (1962); J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed. rev., Barcelona, Ed. Bosch, 1982, T. II, Vol. II, pág. 231.

■ Hemos dicho que "[e]l derecho a dietas y compen-

---

([7]) Castán advierte que hay una fuerte corriente doctrinal que admite que el título constitutivo puede hacer transmisible los derechos de uso y habitación. J. Castán Tobeñas, *Derecho civil español, común y foral*, 13ra ed. rev., Madrid, Ed. Reus, 1983, T. II, Vol. II, págs. 84 y 85.

sación para subsistir es de la naturaleza esencial de una pensión alimenticia, uno de los derechos personalísimos que se extingue con el individuo". *Alonso García v. Comisión Industrial*, 103 D.P.R. 183, 184 (1974). Allí decidimos que los pagos por concepto de dietas del Fondo del Seguro del Estado (F.S.E.), por tratarse de una aportación del Estado para preservar la vida de quien se inutilizó en su trabajo, han de considerarse como derechos personalísimos que se extinguen con la muerte. No son transmisibles, pues, a los herederos aquellos beneficios o plazos de pensión devengados y exigibles, pero impagados por el F.S.E. al sobrevenir el deceso de su causante. Íd., págs. 185–186.

### D. *Validez de la cesión de crédito*

Discutido ya el principio general de la transmisibilidad de los créditos, nos corresponde examinar los requisitos que hacen válida la cesión de un crédito. Ahora bien, antes debemos recordar que este Tribunal ha descrito la cesión de crédito como un negocio jurídico. *IBEC v. Banco Comercial*, supra, pág. 376. "Si en lugar de contrato se prefiere hablar de negocio jurídico, como cauce de expresión de la autonomía privada, ha de tratarse de los que tienen por finalidad la constitución de relaciones obligatorias." Puig Brutau, *op. cit.*, 3ra ed., 1985, T. I, Vol. II, pág. 45.[8]

▆▆ Castán define el negocio jurídico como el " 'acto integrado por una o varias declaraciones de voluntad privada, dirigidas a la producción de un determinado efecto jurídico y a las que el Derecho Objetivo reconoce como base del mismo, cumplidos los requisitos y dentro de los límites que el propio ordenamiento establece' ". Citado por G. Ca-

---

[8] "Con criterio más estricto la palabra contrato hace referencia al acuerdo de voluntades de dos o más partes por el que se crean, modifican o extinguen relaciones pertenecientes al Derecho de obligaciones. En este sentido se ha dicho que todo contrato es un negocio jurídico bilateral, pero que no todo negocio jurídico bilateral es un contrato." J. Puig Brutau, *Fundamentos de Derecho Civil*, 3ra ed., Barcelona, Ed. Bosch, 1988, T. II, Vol. 1, pág. 10.

banellas, *Diccionario Enciclopédico de Derecho Usual*, 20ma ed., Buenos Aires, Ed. Heliastá, 1981, T. V, pág. 535.

 Para que un negocio jurídico sea válido deberá reunir los requisitos exigidos por la ley. En cuanto a su eficacia, "[s]e califica de eficaz el negocio apto para producir los efectos que le corresponden según la regla negocial". F. De Castro y Bravo, *El negocio jurídico*, Madrid, Ed. Inst. Nac. Est. Jur., 1967, pág. 462. Para propósitos del análisis, en *IBEC v. Banco Comercial*, supra, pág. 377, señalamos que existen cuatro (4) requisitos o criterios para determinar la validez de la cesión de un crédito, a saber: que el crédito sea transmisible, que el crédito esté fundado en un título válido y eficaz, que sea un crédito existente y que éste tenga su origen en una obligación válida y eficaz.[9]

 En cuanto al primer criterio, los créditos siempre serán transmisibles, tal y como ya mencionamos, excepto que esté presente alguna de las tres (3) razones de incedibilidad: por haberse pactado, por prohibición legal o por la naturaleza personalísima del crédito.[10] Con relación al segundo criterio, advertimos que el término "título" tiene fundamentalmente dos (2) acepciones jurídicas. Según afirma Roca Sastre, en el sentido substantivo o material, es la causa o razón jurídica de la adquisición, modificación o extinción de un derecho; en el sentido formal o instrumental, el título es la prueba gráfica o documental que constata o autentica aquella causa o razón de adquisición. Véase M.A. Del Arco Torres y M. Pons González, *Diccionario de Derecho Civil*, Pamplona, Ed. Aranzadi, 1984, T. II, pág. 690.

 La existencia del crédito, conforme al tercer crite-

---

[9] "Para que la enajenación del crédito a través de una cesión tenga validez, tiene que existir un crédito transmisible fundado en un título válido y eficaz. Es indispensable que sea un crédito existente que tenga su origen en una obligación que sea válida y eficaz." *IBEC v. Banco Comercial*, 117 D.P.R. 371, 377 (1986).

[10] Véase el Art. 1209 del Código Civil, 31 L.P.R.A. sec. 3373.

rio, es imprescindible para su cesión. No puede cederse un crédito que ya se haya extinguido. En el caso de los créditos litigiosos, el ordenamiento permite su cesión aun cuando la existencia misma del crédito esté sujeta a la confirmación por sentencia del tribunal, tal y como explicaremos más adelante.

En cuanto al cuarto criterio, que la cesión del crédito tenga su origen en una obligación válida y eficaz, recordemos que toda obligación consiste en dar, hacer o no hacer alguna cosa. Art. 1041 del Código Civil, 31 L.P.R.A. sec. 2991. Nuestro ordenamiento identifica cuatro (4) fuentes de las obligaciones: la ley, los contratos, los cuasicontratos, y los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia. Art. 1042 del Código Civil, 31 L.P.R.A. sec. 2992. "El contrato y de manera más amplia el negocio jurídico, es la fuente por excelencia, como dice Hernández-Gil, de las obligaciones." Puig Brutau, *op. cit.*, 3ra ed., 1985, T. I, Vol. II, pág. 47.

Con respecto a los elementos esenciales de la cesión de crédito diremos que son aquellos que la ley exige para todo negocio jurídico: que la declaración (o declaraciones) de voluntad sea hecha por persona (o personas) con capacidad y que exista la concurrencia de consentimiento, objeto y causa.

La cesión de crédito está sometida a los requisitos generales de validez de las convenciones. Resulta suficiente con que el consentimiento no esté viciado, y con la capacidad del cedente y del cesionario. No se exige ningún requisito particular, en especial ninguna formalidad en las relaciones entre las partes, salvo las formas requeridas para las donaciones, si la cesión se hace a título gratuito. H. Mazeud y otros, *Lecciones de Derecho Civil* (L. Alcalá-Zamora y Castillo, traductor), Buenos Aires, Eds. Jurídicas Europa-América, 1960, Parte 2, Vol. III, pág. 494.

### E. *La cesión debe distinguirse de la venta*

Nuestro Código, al igual que el Código español, mantiene la cesión de créditos dentro del contrato de compraventa. "La moderna doctrina española censura al legislador por no haber distinguido entre la cesión de créditos o transmisión activa de las obligaciones y la compraventa del crédito considerado como valor patrimonial susceptible de cambio por dinero." Comentario de G. García Cantero, en M. Albaladejo, *Comentarios al código civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1980, T. XIX, págs. 638–639.

Nuestro Código Civil, en su Art. 1418, equipara la cesión con la venta: "La venta o cesión de un crédito comprende la de todos los derechos accesorios, como la fianza, hipoteca, prenda o privilegio." 31 L.P.R.A. sec. 3943. Este artículo tiene su origen en el Art. 1526 del Código español, el cual ha generado críticas diversas. "Se repite aquí la incorrección de equiparar cesión y venta cuando la cesión puede producirse por otra causa (permuta, donación, *transacción*, aportación a sociedad, fiducia, etc.) pero su sentido es claro y puede salvarse." (Énfasis suplido.) Comentario de García Cantero, *supra*, pág. 656.

Vemos, pues, que la cesión del crédito puede hacerse mediante contrato de transacción. El Art. 1709 del Código Civil, 31 L.P.R.A. sec. 4821, define la transacción como un contrato por el cual las partes, dando, prometiendo o reteniendo cada uno alguna cosa, evitan la provocación de un pleito o ponen término al que ya había comenzado. "Reiteradamente hemos resuelto que una estipulación suscrita por las partes y aceptada por el tribunal, que finaliza un pleito o como en este caso un incidente dentro del pleito, constituye un contrato de transacción que las obliga." *Negrón Rivera y Bonilla, Ex parte*, supra, pág. 74, y casos allí citados.

### F. *La cesión de crédito litigioso*

Se considera litigioso un crédito desde que se contesta a la demanda relativa al mismo. Art. 1425 del Código Civil, 31 L.P.R.A. sec. 3950. No basta la interposición de la demanda, sino que debe trabarse la *litis* con la contestación del demandado para que se conceptúe como litigioso el crédito. Ya en *Martínez, Jr. v. Tribunal de Distrito*, 72 D.P.R. 207, 209 (1951), especificamos que se reputa como litigioso aquel crédito que, puesto en pleito, no puede tener realidad sin previa sentencia firme que lo declare, "o sea aquél que está en duda y se disputa, aquél en el que los derechos son inciertos. Es condición esencial para que un crédito se repute litigioso, la de que la contienda judicial pendiente a la fecha de la venta o cesión del crédito gire sobre la existencia misma del crédito y no meramente sobre las consecuencias de su existencia, una vez determinado por sentencia firme". Véanse, también: *Cámara Insular Etc. v. Anadón*, 83 D.P.R. 374 (1961); *Santana v. Quintana*, 52 D.P.R. 749 (1938).

El crédito litigioso, como cualquier otro crédito, puede cederse. Una vez se cede el crédito litigioso, o se vende como afirma el Art. 1425 del Código Civil, *supra*, el deudor tiene derecho a extinguirlo mediante el pago al cesionario del precio que éste realmente pagó, las costas y los intereses. La doctrina conceptúa este derecho como una restricción a la cesión de créditos litigiosos y la denomina "retracto litigioso" por tratarse de un retracto en favor del deudor cedido.

El origen de esta limitación se remonta a una Constitución del emperador Anastacio (*lex Anastasiana*), ratificada por Justiniano, por vi[rt]ud de la cual se trataba de impedir el tráfico inmoral con los créditos litigiosos, que eran comprados a bajo precio, para obtener luego una excesiva ganancia al cobrarlos íntegramente del deudor. Para evitarlo se concedió al deudor la posibilidad de librarse del cesionario, pagándole tan sólo el mismo precio satisfecho por él, más los gastos e intereses desde el día de la cesión. D. Espín Cánovas, *Manual de Derecho Civil Español*, Madrid, Ed. Rev. Der. Privado, 1983, Vol. III, pág. 240.

El plazo útil para que el deudor cedido ejercite este retracto litigioso es de nueve (9) días, contados desde que el cesionario le reclame el pago. Se trata de un término de caducidad, es decir, fatal, improrrogable e ininterrumpible. *Pereira v. I.B.E.C.*, 95 D.P.R. 28, 67 (1967).[11]

## III

*Transmisibilidad de la causa de acción por sufrimientos y angustias mentales*

Habiendo considerado el principio general de la transmisibilidad de los créditos, así como la figura de la cesión del crédito litigioso, pasemos a examinar la causa de acción del comprador original de una vivienda con vicios de construcción para determinar si es posible ceder dicha acción en su totalidad como crédito litigioso, incluyendo la acción por daños morales.

Debemos comenzar por el análisis de la jurisprudencia pertinente al caso ante nos. En *Pereira v. I.B.E.C.*, supra, págs. 59, 61 y 65, resolvimos que la causa de acción contra el contratista-vendedor es transmisible por cesión a compradores subsiguientes en ausencia de pacto en contrario. También resolvimos que, por ser previsible que la construcción negligente de una vivienda ocasionase angustias y sufrimientos mentales al comprador, el contratista-vendedor es responsable de los daños morales sufridos por su negligencia en el cumplimiento de su obli-

---

[11] El Art. 1426 del Código Civil dispone tres (3) excepciones al derecho del deudor a extinguir un crédito litigioso que describe el precedente Art. 1425 (31 L.P.R.A. sec. 3950):

"Se exceptúan de lo dispuesto en la sección anterior la cesión o venta hecha:

"(1) A un coheredero o condueño del derecho cedido.

"(2) A un acreedor en pago de su crédito.

"(3) Al poseedor de una finca sujeta al derecho litigioso que se ceda." 31 L.P.R.A. sec. 3951.

gación de construir una casa, así como de los daños materiales consistentes en el costo determinado de reparar los vicios o defectos de construcción en la vivienda. Veamos los hechos y los fundamentos para ambas determinaciones.

En el referido caso, en síntesis, los ochenta y tres (83) compradores originales de viviendas en una urbanización presentaron una demanda contra la contratista y la vendedora. Los demandantes alegaron vicios de construcción, reclamaron compensación para corregirlos y responsabilizaron a las demandadas por los daños y perjuicios ocasionados. Durante el juicio hubo prueba testifical de los múltiples defectos que adolecían las casas, así como también de las angustias y sufrimientos mentales de los reclamantes, los grandes inconvenientes y las humillaciones sufridas por éstos al llevar a sus amigos a sus casas, además del temor de los reclamantes por la salud de sus hijos.

De los demandantes originales, nueve (9) de ellos vendieron sus casas quedando sustituidos en el pleito por los segundos adquirentes conforme a las Reglas de Procedimiento Civil. En las escrituras de venta a favor de dos (2) de los adquirentes subsiguientes, Robert Trent y Germán Sigurany, se hizo constar la cesión de la correspondiente causa de acción iniciada contra las demandadas. El tribunal de instancia falló contra la contratista y la vendedora, por lo que concedió una compensación a los demandantes para las diversas reparaciones a fin de corregir los vicios de construcción. Según aclaramos en ese caso, además concedió mil quinientos dólares ($1,500) en unos casos y dos mil quinientos dólares ($2,500) en otros por concepto de daños morales.

A. *Primera determinación de Pereira v. I.B.E.C.: transmisiblidad de la causa de acción*

En *Pereira v. I.B.E.C.*, supra, se resolvió que los compradores originales podían cederle su causa de acción, con respecto a un crédito litigioso, a segundos adquirentes

bajo el principio general de transmisibilidad de los derechos de crédito encarnado en el Art. 1065 del Código Civil, *supra*. En primer lugar, allí no estaban presentes ninguna de las tres (3) excepciones que impiden que se ceda un crédito. Así, pues, no había prohibición legal ni hubo pacto de incedibilidad entre las partes que restringiese la cesión de los derechos de los compradores originales. Tampoco eran incesibles por razón de la propia naturaleza del crédito. *"Estas causas son transmisibles, pues no son derechos personalísimos* como lo son, entre otros, el uso, la habitación, la patria potestad, los alimentos, la tutela y el testamento. *Robles Menéndez v. Tribunal Superior*, 85 D.P.R. 665 (1962)."* (Énfasis suplido.) *Pereira v. I.B.E.C.*, supra, pág. 65.

▉ En segundo lugar, para efectuar la cesión se cumplieron con los requisitos de forma:

> La cesión de crédito litigioso no está entre los contratos cuyo otorgamiento debe constar en documento público a que se refiere el Art. 1232 del Código Civil (31 L.P.R.A. sec. 3453). La cesión en estos casos cumple con los requisitos de la referida Regla 22.3 [que corresponde a la Regla 22.3 vigente], inclusive el de notificación a Tana-Ibec en este caso. No se necesitaba el consentimiento de Tana-Ibec para las transferencias de los referidos créditos. *Pereira v. I.B.E.C.*, supra, pág. 65.

En tercer lugar, en cuanto al efecto de la cesión, se aclaró que éste fue "la sustitución de los compradores originales por otros con respecto al mismo crédito, *perdurando la misma obligación con todos sus derechos accesorios"*. (Énfasis suplido.) *Pereira v. I.B.E.C.*, supra, pág. 65.

En resumen, en virtud de la transmisión de la causa de acción, los adquirentes subsiguientes quedaron en la misma posición que los compradores originales y, por lo tanto, les aprovechaban las gestiones realizadas en tiempo por los anteriores dueños así como sus derechos, quedando sujetos a las mismas responsabilidades y defensas que pu-

730

dieran reclamarse o invocarse en contra de aquéllos. Véase *Zalduondo v. Iturregui*, 83 D.P.R. 1 (1961).

B. *Segunda determinación de Pereira v. I.B.E.C.: la acción por daños morales*

Ya mencionamos que en *Pereira v. I.B.E.C.*, supra, decidimos que el contratista-vendedor de una vivienda con vicios de construcción es responsable tanto de los daños materiales como de los daños morales que su negligencia ocasione al comprador de la vivienda.([12]) Dijimos allí "que bajo los hechos de estos casos, era previsible que la construcción negligente de las casas ocasionase angustias y sufrimientos mentales a las familias que las compraron de Tana-Ibec". Íd., pág. 59. Al concederle compensación por daños morales a los compradores originales, reconocimos que los compradores originales "padecieron los sufrimientos y angustias mentales motivados por los defectos de construcción directamente mientras vivían en sus respectivos y recién adquiridos hogares". Íd., pág. 58.

A pesar de que se reconoció que la cesión del crédito litigioso de los compradores originales era transmisible porque no se trataba de un derecho personalísimo, exceptuamos de recibir la compensación por daños morales a los nueve (9) compradores subsiguientes, entre los cuales estaban los señores Trent y Sigurany a quienes específicamente se les había cedido las causas de acción. Esta excepción aparenta contradecir el principio general de la transmisibilidad de los créditos, por lo que amerita estudiar sus fundamentos.

Como razones para negar la compensación por daños morales, señalamos que fueron los compradores originales quienes "padecieron los sufrimientos y angustias mentales motivados por los defectos de construcción directamente

---

([12]) "Los daños morales están incluídos [sic] en el concepto de angustias mentales ...." *Reyes v. Aponte*, 60 D.P.R. 890, 896 (1942). Véase *Ramos Rivera v. E.L.A.*, 90 D.P.R. 828, 831 (1964).

mientras vivían en sus respectivos y recién adquiridos hogares". *Pereira v. I.B.E.C.*, supra, pág. 58. En esa ocasión expresamos que los compradores subsiguientes no pudieron sufrir tales daños, pues compraron con conocimiento de los defectos de construcción y de las reclamaciones hechas a Tana-Ibec. Íd., pág. 67. De un análisis de la referida excepción a la luz de la línea de jurisprudencia emitida posteriormente, se puede concluir que la base utilizada para negar la compensación a los nueve (9) compradores subsiguientes, entre los que se encontraban los dos (2) cesionarios, fue la ya superada doctrina de que los daños morales sólo pueden concederse a quien de verdad los sufrió y que su compensación no es susceptible de transmitirse a otra persona que no los haya sufrido.

C. *Transmisibilidad de la causa de acción por daños morales*

Seis años después de resolver *Pereira v. I.B.E.C.*, supra, en *Vda. de Delgado v. Boston Ins. Co.*, 101 D.P.R. 598 (1973), reconocimos que el derecho a reclamar por los sufrimientos físicos y morales constituye un bien patrimonial transmisible a los herederos por la muerte de su causante. Se trataba de una reclamación hecha por unos herederos con respecto de "la causa de acción que correspondía a su causante por la tortura moral y física sufrida durante los tres días entre la ocurrencia del accidente y su muerte". *Vda. de Delgado v. Boston Ins. Co.*, supra, pág. 599. Estos herederos ya habían obtenido la compensación por sus propios y personales sufrimientos ocasionados por la muerte de su causante.

Resulta significativo que denominásemos como acción *patrimonial* o heredada la acción personal de la víctima inicial del accidente por los daños que ella misma sufrió, mientras que a la que corresponde por derecho propio a los parientes del fallecido le llamásemos acción di-

recta o personal. Ahora bien, se define como "patrimonio" el conjunto de derechos y obligaciones pertenecientes a una persona, apreciable en dinero. *Vda. de Delgado v. Boston Ins. Co.*, supra, pág. 606.

En *Vda. de Delgado v. Boston Ins. Co.*, supra, no sólo descartamos el aforismo que sostiene que la acción personal muere con la persona (*actio personalis moritur cum persona*), sino que lo criticamos por su anacronismo. Reconocimos que por muchos años no fue posible "reconciliar y mucho menos equilibrar el concepto de sufrimiento y angustia con el de compensación pecuniaria; la arraigada noción ética de que ninguna suma de dinero podría recibirse en pago de un agravio sin conllevar un sentido de claudicación mercantilista y cierta desaprobación de la opinión pública". Íd., pág. 605.

▇▇▇▇ En la actualidad, la causa de acción por las angustias y sufrimientos del causante se conceptúa un bien patrimonial susceptible de ser transmitido a los herederos.

Habiendo tomado carta de naturaleza en nuestro ordenamiento civil el precepto y la práctica de convertir a indemnización pecuniaria adecuada el dolor y sufrimiento humano originado por el acto negligente, *se le impartió carácter patrimonial al derecho a reclamarla*, y representando ese derecho o causa de acción un bien valorable en dinero con normas de estimación o valoración que han ganado la aprobación ética de la sociedad contemporánea, *no hay razón legal ni moral para excluirlo* del acervo o caudal relicto transmitido por el causante a sus herederos. (Énfasis suplido y escolio omitido.) *Vda. de Delgado v. Boston Ins. Co.*, supra, págs. 605–606. Véase, también, *Publio Díaz v. E.L.A.*, 106 D.P.R. 854, 872 (1978).

▇▇▇▇▇ No hay duda, entonces, que el derecho del causante a obtener indemnización por los daños sufridos es un bien transmisible a los herederos, "pues, en definitiva, *es un derecho de crédito perfectamente transmisible* al amparo de las reglas generales que regulan la transmisibili-

dad de los derechos". (Énfasis suplido.) Puig Brutau, *op. cit.*, T. V, Vol. 1, 1961, pág. 55. Esta causa de acción civil reparadora del daño inferido al causante no está en la lista de derechos personalísimos que mueren con la persona ni está afectada por razón de la naturaleza del negocio jurídico que le sirve de base, ni tampoco le afecta disposición de ley alguna.

█ Si la causa de acción por daños morales se trata de un derecho perfectamente transmisible por la vía sucesoral, también debe ser transmisible mediante la cesión a personas con interés en el asunto. En principio, no hay razón jurídica ni moral que nos permita concluir lo contrario.

## IV

*Cesión de la causa de acción por daños morales*

En el caso ante nos, los demandantes cedieron a la demandada recurrente C.R.U.V. todos sus derechos, acciones, causas de acción por daños y perjuicios, vicios de construcción y gastos incurridos con relación a su apartamento individual como en cuanto a su participación en los elementos comunes del Condominio Orquídeas. Las recurridas Hampton y National Insurance Company se oponen a la cesión hecha a la C.R.U.V. de las causas de acción por sufrimientos y angustias mentales. No tienen razón.

La cesión del crédito hecha por los condóminos demandantes *a una de las partes en el pleito* es válida, pues cumple todos los requisitos expuestos en *IBEC v. Banco Comercial*, supra. Se trata de un crédito transmisible, ya que no está presente ninguna de las tres (3) excepciones al principio general de la transmisibilidad de los créditos. No hubo pacto de incedibilidad y, repetimos, la cesión se hizo a una

parte interesada.(¹³) No existe disposición legal que la prohíba ni tampoco es un crédito incesible por su naturaleza. Ya vimos que la causa de acción por daños morales no se extingue por la muerte; mucho menos se va a extinguir en vida de su titular.

■ No nos convencen los argumentos de las recurridas cuando afirman que se trata de una acción unida indefectiblemente a la persona. Si bien es cierto que los daños morales sólo los sufre la víctima del daño, hay que distinguir las angustias mentales propiamente dichas de aquella causa de acción que nace por las angustias mentales sufridas. La causa de acción por daños morales no se trata de un derecho personalísimo, pues no se ceden los sufrimientos en sí —lo cual no es posible— *sino que lo que se cede es la causa de acción civil reparadora que provocan esos daños morales.*

■ Tampoco es dicha cesión contraria a la moral y al orden público dentro de nuestro ordenamiento.(¹⁴) Si no obsta al buen sentido de la moral que se transmita una causa de acción por daños morales a unos herederos, tampoco puede entenderse contrario al orden público que se transmita esa misma causa de acción *a parte interesada.* Podría tratar de argumentarse que en el caso de los herederos se trata de los familiares del causante con quien mantiene vínculos de intimidad, pero tal argumento es engañoso. En el derecho de sucesiones, la institución del heredero no exige necesariamente que éste sea un familiar del causante, porque en el orden sucesoral una persona que no tuvo vínculo afectivo ni familiar con el causante puede ser designado heredero. Sabemos que hasta el Estado Libre Asociado, que es una persona jurídica, puede ser

_____

(¹³) Ejemplos de partes interesadas lo serían las partes actuales o potenciales en un pleito, las compañías de seguros, los familiares del cedente, etc.

(¹⁴) Existen otras jurisdicciones, tanto civilistas como anglosajonas, que prohíben la cesión por los daños morales.

heredero. Por otra parte, el heredero no tiene que haber presenciado los sufrimientos de su causante para que se le transmita la causa de acción; *en igual posición que el heredero estaría una parte interesada.*

En la sentencia parcial recurrida se afirma que la causa de acción por sufrimientos y angustias mentales está tan ligada a la persona que de sostenerse la cesión se desvirtuaría la naturaleza de la misma. No podemos estar de acuerdo. Los sufrimientos que padeció la víctima no pueden borrarse con cantidad de dinero alguna, pero nuestro ordenamiento permite que se compensen con dinero o signo que lo represente. *No importa de quién provenga la compensación —bien sea de quien provocó el daño directamente o del cesionario a quien la víctima le transmite su causa de acción— la reparación seguirá siendo una compensación monetaria.*

En este caso existe un interés público por tratarse de condóminos de ingresos limitados quienes se beneficiaron de un programa de vivienda con un fin social auspiciado por las cesionarias C.R.U.V. y el Banco, y que mediante la cesión de la causa de acción pudieran obtener, con mayor prontitud, el resarcimiento de los daños sufridos. Puede ser que en otros casos el cesionario no ostente tal responsabilidad social y que se intente adquirir las causas de acción por daños morales para fines especulativos. Para evitar que se trate de especular con el sufrimiento y que se aprovechen de la desventura ajena, *limitamos la cesión de la causa de acción por sufrimientos y angustias mentales, como crédito litigioso, a partes interesadas y a que el cesionario sólo pueda recobrar el precio que realmente pagó por el crédito, las costas y los intereses.*

Los daños y perjuicios alegados en la demanda, incluyendo los sufrimientos y las angustias mentales, deberán ser probados ante el tribunal en su día. Conforme a lo pactado en el contrato de transacción entre los demandantes

cedentes y las demandas cesionarias, los condóminos deberán estar disponibles para testificar en el juicio en su fondo de así solicitárselo las cesionarias. De la determinación que tome finalmente el tribunal con respecto a tales daños dependerá la existencia del crédito cedido a la C.R.U.V. y al Banco.

Fue válida la cesión de crédito hecha por los condóminos del Condominio Orquídeas. *Se hizo a una parte interesada y cumple con el requisito de IBEC v. Banco Comercial, supra, de que el crédito está fundado en un título válido y eficaz.* La C.R.U.V. y el Banco obtuvieron la causa de acción mediante un contrato de transacción. La cesión de un crédito litigioso no está entre los contratos cuyo otorgamiento debe constar en documento público conforme al Art. 1232 del Código Civil, 31 L.P.R.A. sec. 3453. Por tratarse de una estipulación entre las partes sometida al tribunal de instancia, se le envió copia a las aquí recurridas, por lo cual quedaron debidamente notificadas.

La cesión de crédito en este caso cumplió, además, con el requisito de que el crédito tenga su origen en una obligación válida y eficaz. Por ser la transacción un contrato consensual y bilateral, se pactaron prestaciones tanto al cedente como al cesionario. La obligación de los condóminos fue ceder todas sus causas de acción a la C.R.U.V. y al Banco. La obligación de la C.R.U.V. y el Banco fue entregar un apartamento en la Villa Panamericana, dinero en efectivo en ciertos casos o ambas cosas, así como cancelar las hipotecas de los apartamentos de los demandantes en el Condominio Orquídeas. En el contrato de transacción concurrieron objeto, consentimiento y causa.

Por tratarse de una cesión de crédito litigioso válidamente hecha, *a una parte interesada*, resolvemos que es transmisible la causa de acción por sufrimientos y angustias mentales cedida por los demandantes a las recurrentes Corporación de Renovación Urbana y Vivienda y el Banco de la Vivienda. *De resolver el tribunal que medió*

*negligencia y que efectivamente se le ocasionaron daños emocionales a los cedentes deberá, para fijar los daños, determinar la cantidad que realmente pagó la C.R.U.V. a los condóminos por la causa de acción por daños morales y emocionales cedida.*

Por todo lo antes expresado, *se dictará sentencia revocando la sentencia parcial emitida por el foro de instancia y devolviendo el caso para que continúen los procedimientos de forma compatible con esta opinión.*

El Juez Asociado Señor Negrón García emitió una opinión disidente, a la cual se unió el Juez Asociado Señor Hernández Denton. El Juez Asociado Señor Fuster Berlingeri concurrió sin opinión escrita.

— O —

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Hernández Denton.

La cesión como crédito litigioso de una causa de acción por sufrimientos y angustias mentales es nula por ser contraria al orden y a la moral pública. Los sufrimientos y angustias mentales responden al concepto de daño moral. "[E]s, por exclusión, el daño no patrimonial, es el daño que no recae directamente sobre el patrimonio de una persona, o que cayendo sobre bienes objetivos, ocasione o no lesión material en los mismos, *causa una perturbación anímica en su titular*, cualquiera que sea el derecho que sobre ellos se ostente. El daño moral es, pues, *daño espiritual, daño inferido en derechos de la estricta personalidad, o en valores que pertenecen más al campo de la afección que de la realidad material, económica.* El daño moral es la lesión ocasionada en los bienes no económicos de una persona, *o la repercusión afectiva desfavorable producida por los da-*

*ños materiales.* (Énfasis suplido.) G. Ortiz Ricol, *Valoración Jurídica del Daño Moral,* 48 Rev. Der. y Leg. 24 (1959).

Según este ámbito conceptual, la cesión de esa causa de acción no es otra cosa que un negocio que reduce a una escueta ecuación utilitaria la ética intrínseca en que se apoya · el sistema jurídico compensatorio de daños mentales. En una sociedad como la nuestra, con un apetito voraz hacia lo material, no deberíamos convertir el dolor, el sufrimiento, la tristeza, el desamparo y la frustración, en simplemente otro bien de consumo y en tráfico comercial. Elaboremos.

## · I

En materia de cesión de créditos la norma general es la transmisibilidad, "con sujeción a las leyes, si no se hubiese pactado lo contrario". Art. 1065 del Código Civil, 31 L.P.R.A. sec. 3029. Este precepto, si bien establece, no regula la transmisión de las obligaciones. M. Albaladejo, *Comentarios al código civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1989, T. XV, Vol. 1, pág. 987. La doctrina moderna critica, como bien señala la opinión del Tribunal, la orientación del Código de reglamentar la cesión de créditos dentro de la normativa de la compraventa. L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 4ta ed., Madrid, Ed. Tecnos, 1984, Vol. II, pág. 319; D. Espín Cánovas, *Manual de Derecho Civil Español*, Madrid, Ed. Rev. Der. Privado, 1983, Vol. III., pág. 234. El señalamiento cabe, pues debemos distinguir entre la "sucesión activa de un crédito" y "la causa o negocio básico de tal cesión, que puede ser, no sólo la compraventa, sino otro contrato cualquiera". J.M. Manresa, *Comentarios al Código Civil Español*, 6ta ed. rev., Madrid, Ed. Reus, 1967, T. VIII, Vol. I, pág. 341. Dependiendo de "[la] causa justificativa [de la cesión] habrán de entrar en función las normas jurídicas

relativas a la misma". Díez-Picazo y Gullón, *op. cit.*, pág. 319.

Aunque la opinión mayoritaria identifica acertadamente tres (3) categorías de casos de incedibilidad —dos (2) derivadas del texto del Art. 1065 del Código Civil, *supra*, y una en atención a la propia naturaleza del crédito— incurre en el error fundamental de aseverar que "[s]i no obsta al buen sentido de la moral [y al orden público dentro de nuestro ordenamiento] que se transmita una causa de acción por daños morales a unos herederos, tampoco puede entenderse contrario al orden público que se transmita esa misma causa de acción a [un cesionario]". Opinión mayoritaria, pág. 735.

Como técnica de interpretación, la analogía entre la sucesión mortis causa y la cesión de créditos es deficiente; más que un válido razonamiento por inducción o deducción, representa un salto mortal al vacío. *Vda. de Delgado v. Boston Ins. Co.*, 101 D.P.R. 598 (1971), sólo resolvió que el derecho de un causante a reclamar por sus daños morales es un bien patrimonial transmisible por muerte a sus herederos. La mayoría ahora se equivoca al concluir que esa transmisibilidad, en el contexto de la sucesión mortis causa, impone la transmisibilidad de esta causa de acción mediante cesión.

*Vda. de Delgado v. Boston Ins. Co.*, supra, es un precedente pobre para avalar la decisión de hoy. Sólo plasmó una política judicial de profunda justicia y eticidad inspirada en el interés dual de que el daño causado fuera indemnizado y que la muerte de la víctima no sirviera para premiar al que la causó.[1] Aquí no existe ese peligro, pues

---

[1] Este interés se expresó así:

"La reparación del daño causado al destruir una vida, hasta donde pueda concebirse la indemnización pecuniaria como justo valor de esa pérdida, es una de las sanciones que el cuerpo social impone al ofensor que bien por acto criminoso o por negligencia es responsable de la muerte de uno de sus integrantes. Constituiría un sarcasmo y un quebrantamiento de la justicia premiar al autor del acto culposo con inmunidad parcial, pues no otra cosa lleva consigo negar a los herederos el derecho a

los perjudicados están en posición de vindicar sus derechos, como en efecto lo hicieron, al instar la acción objeto del contrato de transacción y cesión cuya nulidad nos ocupa.

La pretendida similitud entre la transmisibilidad de la acción por daños morales a unos herederos y la causa de acción a unos cesionarios es insostenible. En rigor científico, *Vda. de Delgado v. Boston Ins. Co.*, supra, responde a la incompatibilidad entre la máxima *actio personalis moritur cum persona* y el principio cardinal de nuestro ordenamiento que reconoce al heredero como el continuador de la personalidad jurídica de su causante.[2] *Feliciano Suárez, Ex parte*, 117 D.P.R. 402, 414 (1986); *Silva v. Doe*, 75 D.P.R. 209, 216 (1953); *Arroyo v. Fernández*, 68 D.P.R. 514, 517 (1948); *Sosa v. Sucn. Morales*, 58 D.P.R. 360, 364 (1941). De más está decir que la cesión concernida en el caso de autos *no* implica ese principio. En primer lugar, se trata de transmitir la causa de acción convencionalmente y no por mandato de ley como ocurre en la sucesión mortis causa; y como dijimos, las personas que sufrieron el daño viven y están aptos para reclamar.

## II

El Art. 1207 del Código Civil proclama así la autonomía de la voluntad: "Los contratantes pueden establecer los

---

exigir la justa indemnización por el dolor y tortura de la víctima." *Vda. de Delgado v. Boston Ins. Co.*, 101 D.P.R. 598, 606 (1971).

[2] La opinión del Tribunal en *Vda. de Delgado v. Boston Ins. Co.*, supra, pág. 600, explicó:

"La razón principal que se ha venido oponiendo como muro de contención a la franca tendencia contemporánea hacia la trasmisibilidad por herencia de esta causa de acción tiene su raíz en una subconciente atadura intelectual al viejo aforismo de que la acción personal muere con la persona (*actio personalis moritur cum persona*), doctrina sin fe de bautismo que escaló subrepticiamente los niveles de expresión del derecho común y que además de anacrónica es incompatible con nuestro sistema de derecho civil en su premisa fundamental de ser el heredero continuación de la personalidad jurídica del finado." (Escolio omitido.)

pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público." 31 L.P.R.A. sec. 3372.

Este principio consagra la libertad que gozan los particulares en el ámbito de las obligaciones, para regular sus propios intereses y fijar el contenido de los contratos. Espín Cánovas, *op. cit.*, pág. 365; J.L. Lacruz Berdejo, *Elementos de Derecho Civil*, Barcelona, Ed. Bosch, 1977, Vol. II, pág. 10. En su origen respondió a la ideología liberal imperante en el siglo pasado que, como es sabido, experimentó en nuestros tiempos poderosas limitaciones. Estas limitaciones son consecuencia de la intervención activa del estado moderno en la vida económica, a tono con la nueva concepción social del derecho. Díez-Picazo y Gullón, *op. cit.*, págs. 33–34; Espín Cánovas, *op. cit.*, págs. 364–365.[3]

La posibilidad de esta reducción a la autonomía contractual está señalada en el propio Art. 1207 del Código Civil, *supra*, al mencionar, como límites a la libertad de los particulares, la ley, la moral y el orden público. E. Vázquez Bote, *Tratado práctico y crítico de derecho privado puertorriqueño*, New Hampshire, Ed. Equity, 1992, Vol. IX, pág. 16.

En *Hernández v. Méndez & Assoc. Dev. Corp.*, 105 D.P.R. 149, 150 (1976), definimos el orden público como "el conjunto de valores eminentes que guían la existencia y bienestar de una sociedad. El concepto orden público recoge y ampara un interés social dominante por su transcendencia, por el número de personas que afecta y por la valía de los derechos que tiende a proteger. *Wiley v. Livingston*, 376 U.S. 543, 549–50 (1964). En gran medida el orden público es acopio de normas de moral y de ética pública que en ocasiones alcanzan su exposición en ley, pero

---

[3] Un buen ejemplo es la doctrina de los contratos de adhesión. Véanse: *Maryland Casualty Co. v. San Juan Racing Assoc. Inc.*, 83 D.P.R. 559, 566–567 (1961); L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 4ta ed., Madrid, Ed. Tecnos, 1984, Vol. II, pág. 34.

que aun sin esa expresa declaración legislativa, constitu-
yen principios rectores de sabio gobierno nacidos de la ci-
vilización y fortalecidos por la cultura, la costumbre, por la
manera de ser, en fin por el estilo de una sociedad".

Esta definición fue reiterada en *Unisys v. Ramallo Bro-
thers*, 128 D.P.R. 842 (1991). Un análisis suscinto de esta
concepción revela que el orden público, aunque se nutre de
la ley vigente, no se limita a ésta y recibe el insumo de
otras fuentes de normas tales como la *moral* y la cultura.[4]
En la doctrina de habla española, Bonet Ramón esboza
una posición similar, a saber, el orden público es "un con-
junto de normas de orden superior, no solamente jurídicos
(públicos y privados), sino también políticos, económicos,
morales, y algunas veces religiosos, absolutamente obliga-
torios, por ser considerados esenciales para la conservación
del orden social, en un pueblo y una época determinados".
F. Bonet Ramón, *Código Civil Comentado*, Madrid, Ed.
Aguilar, 1962, pág. 950.

Debido a que el orden público, según definido, no se li-
mita a la ley vigente, forzoso es concluir que nos corres-
ponde, como poder judicial, darle concreción en cada caso a
lo que de otra forma es un concepto difuso.[5] De otra

---

[4] En contra, la opinión disidente del Juez Asociado Señor Rebollo López en
*Util. Cons. Servs. v. Mun. de San Juan*, 115 D.P.R. 88, 99–100 (1984).

[5] Esta posición informa la doctrina francesa moderna. Los proponentes de la
llamada dirección extrapositiva, perciben el orden público como "un principio limita-
dor de la autonomía de la voluntad aun fuera de todo texto legal". D. Espín Cánovas,
*Las nociones de orden público y buenas costumbres como límites de la autonomía de
la voluntad en la doctrina francesa*, 16 (Núm. 3) An. Der. Civ. 783, 790 (1963). Según
esta visión, compete al juez decidir cuándo interviene el orden público, sin que ello
signifique que se trata de una determinación "puramente subjetiva" del capricho
judicial. Este tiene que guiarse por las leyes, espíritu de la legislación, tendencias de
la opinión pública y por la observación de los hechos económicos y sociales. Íd., págs.
790–791.

En contrario, la escuela exegética o positiva postula que "l[a]s reglas de orden
público han de traducirse en leyes, por lo que se habla, según los autores partidarios
de la misma, más bien que del orden público, de las leyes de orden público". Espín
Cánovas, *supra*, pág. 786. El problema principal de este enfoque es que el orden
público limitaría la voluntad privada sólo en la medida en que es articulado
legislativamente. Íd., pág. 790.

forma, la mención del "orden público" en el Art. 1207 del Código Civil, *supra*, representaría una redundancia ya que sería sinónimo perfecto del vocablo "ley", como límite a la voluntad privada.

. La cesión de créditos litigiosos no ha sido favorecida tradicionalmente. El Art. 1425 del Código Civil, que instituye el retracto de créditos litigiosos, dispone:

> Vendiéndose un crédito litigioso, el deudor tendrá derecho a extinguirlo, reembolsando al cesionario el precio que pagó, las costas que se le hubiesen ocasionado y los intereses del precio desde el día en que éste fue satisfecho.
>
> Se tendrá por litigioso un crédito desde que se conteste a la demanda relativa al mismo.
>
> El deudor podrá usar de su derecho dentro de nueve (9) días, contados desde que el cesionario le reclame el pago. 31 L.P.R.A. sec. 3950.

Este artículo es producto de la desconfianza histórica en los compradores de créditos litigiosos "que acostumbra[ba]n especular con el litigio comprando a bajo precio los derechos discutidos y persiguiendo después con saña al deudor". J. Castán Tobeñas, *Derecho civil español, común y foral*, 15ta ed., Madrid, Ed. Reus, 1988, T. 3, pág. 350. Espín Cánovas, como señala la opinión mayoritaria, considera este retracto una auténtica limitación a la cesión de créditos litigiosos y explica su origen en el derecho romano:

> ...La cesión de créditos litigiosos supone, más que una modalidad de cesión, una restricción a la posibilidad de ceder un

---

El tratamiento jurisprudencial dado al concepto de orden público se asemeja al propuesto por la escuela extrapositiva. *Hernández v. Méndez & Assoc. Dev. Corp.*, 105 D.P.R. 149 (1976); *Asoc. de Condóminos v. Seguros Arana*, 106 D.P.R. 133 (1977). En este último, invalidamos una cesión de cánones de arrendamiento de un condominio que comprometía dichos cánones en perjuicio de la cuotas de gastos comunes impagadas por el titular del condominio. Dijimos:

"La afirmación dispersa por todo el estatuto de la inescapable dependencia económica del régimen de propiedad [horizontal] sobre el pago oportuno de estas cuotas es suficiente expresión legislativa para excluir como nulo y contrario a la ley y al orden público todo pacto o contrato que tienda a desviar hacia otros propósitos los dineros necesarios para sufragar los gastos comunes. (Art. 1207, Código Civil—31 L.P.R.A. sec. 3372.)." *Asoc. de Condóminos v. Seguros Arana*, supra, pág. 137.

crédito litigioso, en razón de la concesión al deudor cedido de la facultad de extinguirlo, pagando al cesionario el precio que pagó con los gastos e intereses. El origen de esta limitación se remonta a una Constitución del emperador Anastasio (*lex anastasiana*), ratificada por Justiniano, por vi[rt]ud de la cual se trataba de impedir el tráfico inmoral con los créditos litigiosos, que eran comprados a bajo precio, para obtener luego una excesiva ganancia al cobrarlos íntegramente del deudor. Para evitarlo se concedió al deudor la posibilidad de librarse del cesionario, pagándole tan sólo el mismo precio satisfecho por él, más los gastos e intereses desde el día de la cesión.

Así configurada esta restricción a la cesión de los créditos litigiosos, ha pasado al Derecho Moderno, estimándose generalmente por la doctrina que se trata de un retracto en favor del deudor cedido y conociéndosela ordinariamente con el nombre de *retracto litigioso*. Espín Cánovas, *op. cit.*, pág. 240.

De esta exposición se deriva una importante lección: nuestro derecho positivo contiene en el Art. 1425 del Código Civil, *supra*, una aprehensión, de profunda raigambre en el Derecho Civil, con relación al contenido moral del tráfico de créditos litigiosos. La opinión mayoritaria, al avalar la inclusión de la acción por daños morales en ese tráfico desfavorecido, trastoca el elemento ético de la sanción resarcitoria y da paso a que se especule con el medio provisto en ley para resarcir lesiones íntimamente ligadas a la persona.

## III

En el fondo, la opinión mayoritaria descansa en una contradicción irreconciliable, producto de una abstracción conceptual que pretende separar lo inseparable: la causa de acción por daños morales del sufrimiento humano que precisamente va dirigida a indemnizar. Nos referimos a la hipótesis de que "no se ceden los sufrimientos en sí —lo cual *no es posible*— sino que lo que se cede es la causa de *acción civil reparadora* que provocan esos daños morales". (Énfasis en el original suprimido y énfasis suplido.) Opi-

nión mayoritaria, pág. 734. Esta distinción se desploma estrepitosamente al confrontarla con dos (2) realidades. La primera, que toda *causa de acción* se descompone en tres (3) elementos: (1) acción u omisión; (2) daños; (3) relación causal entre éstos. Es evidente, pues, que contrario a la afirmación mayoritaria, "la acción civil reparadora" no es otra cosa que un juego de palabras cuyo contenido, a la postre, son los elementos de toda causa de acción, entre ellos, los sufrimientos que nutren los daños morales. Únicamente por ficción puede sostenerse la pretendida distinción. Y segundo, el contrato de transacción de los demandantes y la C.R.U.V. requiere que aquéllos presten testimonio y demuestren en el tribunal la existencia de sus sufrimientos y angustias mentales. La valoración justa de esos sentimientos y sensaciones íntimas —dolor, pesares, tristeza, desamparo, etc.— es un problema inherente a la compleja cuantificación de daños subjetivos morales. Su adjudicación descansa en la discreción y conciencia del juez que examina la prueba. *Urrutia v. A.A.A.*, 103 D.P.R. 643, 647 (1975).

" '[L]a determinación de una compensación justa y razonable por los daños sufridos [es] tarea que constituirá un reto aun para un Salomón del siglo XX.' " *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762, 805 (1987). Al permitirse la cesión concernida en este caso, el juzgador de hechos enfrentará la ilógica tarea de cómo valorar esos sufrimientos; esto es, el dolor y las angustias de unas personas que han demostrado con sus actuaciones que ya no tienen interés en ser indemnizados.

...El crédito surgido del daño moral sufrido por la víctima, alcanzada o no alcanzada en su persona física, está, por el contrario, "unido exclusivamente a la persona"; únicamente la víctima o sus herederos, por ser éstos los continuadores de la persona de aquélla, pueden ejercitarla. *Sería tan chocante ver a una víctima ceder a un tercero el precio de sus sufrimientos como ver que esos acreedores se apoderaban de semejante valor.*

> Cuanto sea perjuicio moral se encuentra fuera del comercio; los créditos que puedan surgir de ello permanecen unidos indisolublemente a la persona de la víctima, continuada, por lo demás, por sus herederos; las acciones que sancionan esos créditos no pueden ser ejercitadas ya ni por un cesionario ni por un acreedor. (Énfasis suplido.) H. Mazeaud y A. Tunc, *Tratado teórico y práctico de la responsbilidad civil delictual y contractual*, Buenos Aires, Eds. Jurídicas Europa-América, 1977, T. 2, Vol. II, pág. 548.

*Recapitulando*, la cesión de una causa de acción por daños morales es contraria al orden público. Representa, un negocio que no deberíamos refrendar.

En razón de su falta de contenido ético, no debe ser amparada jurídicamente. La valoración judicial de la vida no puede "queda[r] resumida a un negocio, [donde] la moral consiste en hacer ganancias, el placer es el ingreso y el dolor el gasto, y la virtud es simplemente un hábito de hacer bien las cuentas". R.L. Vigo, *La Función Judicial*, Ed. Depalma, 1981, pág. 74.