Bajandas Vélez, Juez Ponente
*752 TEXTO COMPLETO DE LA SENTENCIA
Comparecen ante nos Lausell & Carlo, Inc. (Lausell & Cario) y Touchvision Realty Corp. (Touchvision) (en conjunto las apelantes) mediante el recurso de apelación de epígrafe. Nos solicitan que revoquemos la Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (el TPI) el 22 de diciembre de 2005 y notificada el subsiguiente día 29. Por medio de dicha Sentencia, el TPI declaró ha lugar la moción de sentencia sumaria presentada por el Sr. Ed Lieberman (Sr. Lieberman) y Tickets To Go, Coip. (los apelados) y desestimó la demanda presentada por las apelantes al concluir que entre las partes no existió nexo contractual alguno que obligara a los apelados a cumplir los acuerdos alegados por las apelantes.
Analizado el recurso y el derecho aplicable, resolvemos confirmar la Sentencia apelada.
I
El 5 de septiembre de 2003, los apelantes presentaron una demanda sobre cobro de dinero y daños y perjuicios en contra de Casatrón, Inc., Tickets To Go d/b/a Sunshine Investment Corp., el Sr. Lieberman; Joseph Costanzo (Sr. Costanzo), Fulana de tal y la sociedad de gananciales constituida por los últimos dos. Alegaron que Lausell & Cario fue propietaria del edificio comercial localizado en San Juan conocido como American Airlines Building (el edificio), hasta julio de 2002. Adujeron que Touchvision advino a ser la dueña del edificio desde agosto de dicho año en adelante. Señalaron además que Casatrón subarrendó un espacio comercial en el aludido edificio en septiembre de 1997 y que, ante la falta de pago de los correspondientes cánones de arrendamiento, Lausell & Caído comenzó un procedimiento de desahucio en junio de 2002. Argüyeron que en julio de ese año, el Sr. Lieberman solicitó que Lausell & Caído pospusiera los procedimientos del desahucio porque estaba haciendo gestiones para adquirir Casatrón, y precisaba de tiempo para llegar a un acuerdo. Sostuvieron que conforme a tal petición, Lausell & Cario desistió sin perjuicio de la acción de desahucio.
Por otra paite, las apelantes alegaron que en septiembre de 2002, Lausell & Cario llegó a un acuerdo con el Sr. Lieberman por medio del cual éste pagaría $12,000 de los $41,896.87, adeudados por Casatrón en concepto de renta hasta el 30 de junio de 2002. Asimismo, adujeron que a tenor del acuerdo, Casatrón y/o Tickets To Go continuarían el pago de la renta a partir del mes de julio, y que permanecerían en el edificio hasta mayo de 2003. Así, reclamaron que Touchvision les adeudaba la renta correspondiente al período de agosto de 2002 hasta mayo de 2003, la que ascendía a $38,853.12, y la renta del mes de julio de 2002 montante a $3,704.24.
*753 Conforme a tales alegaciones, las apelantes reclamaron a Casatrón y al Sr. Lieberman el pago, en forma solidaria, de las siguientes cantidades: $45,601.11 a Lausell & Caído por las rentas adeudadas hasta julio de 2002; $38,853.12 a Touchvision por concepto de renta desde agosto de 2002 a mayo de 2003; los intereses sobre tales sumas; $3,000 a Lausell & Cario en honorarios de abogado por el desistimiento del desahucio; y una suma no menor de $20,000 en daños y perjuicios por la alegada merma de ingresos y rendimiento de intereses generada por la falta de pago de las rentas.
El 15 de marzo de 2004, los apelados presentaron su contestación a la demanda. Negaron las alegaciones medulares de esta última. En particular, negaron la versión de los apelados respecto a los acuerdos y conversaciones habidos entre las partes.
Trabada así la controversia, en una sentencia parcial final emitida el 22 de abril de 2004, el TPI archivó la demanda con perjuicio respecto a Sunshine Investment Coip. Posteriormente, el 23 de septiembre de 2004 dictó otra sentencia parcial final, acorde con la Regla 4.3(b) de las de Procedimiento Civil, en la que ordenó el archivo con perjuicio de la demanda respecto a Casatrón, el Sr. Costanzo, Fulana de tal y la sociedad de gananciales.
El 5 de octubre de 2005, los apelados presentaron Moción Solicitando Desestimación. En esencia, argüyeron que el descubrimiento de prueba llevado a cabo reflejaba que no existía contrato alguno que atara al Sr. Lieberman y a Tickets To Go con la deuda reclamada en la demanda. Fundamentaron su posición en las deposiciones tomadas al Sr. Tomás Torres Otero (el Sr. Torres Otero) y al Ledo. Félix Román Carrasquillo (el Ledo. Román), testigos anunciados por las apelantes, y al Sr. Lieberman.
En escrito fechado 15 de noviembre de 2005, las apelantes se opusieron. Sostuvieron que conforme a las alegaciones de la demanda existía una causa de acción a su favor al igual que un remedio. Argüyeron que el TPI debía oír el testimonio de todos los testigos, ya que los apelados citaron trozos aislados de las aludidas deposiciones. Finalmente, esgrimieron que la controversia de si existió o no un contrato entre las paites era una cuestión de derecho que debía ser dirimida en una vista plenaria. Para sustentar sus argumentos, las apelantes anejaron una carta fechada 16 de septiembre de 2002 dirigida al Sr. Lieberman y firmada por el Sr. Torres Otero y fragmentos de las deposiciones tomadas al referido testigo y al Ledo. Román.
Atendidos los aludidos escritos de las paites, el 22 de diciembre de 2005, el TPI dictó la Sentencia apelada, la cual fue notificada el subsiguiente día 29. Surge de dicha Sentencia que el TPI acogió la solicitud de desestimación presentada por los apelados como una moción de sentencia sumaria, la declaró ha lugar, y desestimó la demanda presentada por las apelantes. Basó su determinación en que las deposiciones sometidas coincidían esencialmente en que “... en momento alguno se formalizó acuerdo contractual alguno entre [el Sr.] Lieberman y los demandantes [las apelantes] para que aquél o TTG [Tickets to Go] asumiera la renta, los atrasos o la ocupación del local arrendado por Casatr[ó]n, ya sea por sí mismo o como sucesor de ésta. ” También concluyó que las deposiciones coincidían “... en que las conversaciones se limitaron exclusivamente a la posibilidad de concretizar negociaciones futuras para resolver todo lo relacionado a la deuda incurrida por Casatrón y que estas conversaciones no dieron resultado alguno”. 
Insatisfechas, el 30 de enero de 2006, las apelantes presentaron el recurso de apelación de epígrafe en el que imputan que el TPI “... erró al emitir una sentencia desestimando sumariamente la demanda cuando de los autos surge que existen controversias de hecho[s] materiales en el caso”. 
Posteriormente, el 9 de marzo de 2006, los apelados presentaron su alegato de oposición.
Con el beneficio de los alegatos de las partes, pasamos a resolver.
*754 II
A
Las obligaciones nacen de la ley, los contratos y cuasicontratos y de los actos y omisiones ilícitas en que intervenga culpa o negligencia. Art. 1042 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 2991; Laureano Pérez v. Soto, 141 D.P.R. 77, 90 (1996); Consejo de Titulares v. C.R.U.V., 132 D.P.R. 707, 724 (1993).
El contrato, como una de las fuentes de las obligaciones, tiene fuerza de ley entre las partes, y deben cumplirse al tenor de los mismos. Art. 1044 del Código Civil, 31 L.P.R.A. see. 2994. Los contratos existen desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio. Artículo 1206 del Código Civil, 31 L.P.R.A. see. 3371; Amador v. Conc. Igl. Univ. de Jesucristo, 150 D.P.R. 571, 581-582 (2000). Existe un contrato cuando concurren los siguientes requisitos: (a) consentimiento de los contratantes; (b) objeto cierto que sea materia del contrato, y (c) causa de la obligación que se establezca. Artículo 1213 del Código Civil, 31 L.P.R.A. see. 3391; Díaz Ayala et al. v. E.L.A., 153 D.P. R. 675 (2001). Una vez concurren las condiciones esenciales para su validez, los contratos son obligatorios. Artículo 1230 del Código Civil, 31 L.P.R.A. see. 3451.
De conformidad con el principio rector de pacta sunt servanda, las partes contratantes se obligan a todos los extremos de lo pactado que sean conformes a la ley, a la moral y al orden público. Artículo 1210 del Código Civil, 31 L.P.R.A. see. 3375. Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarias a las leyes, a la moral, ni al orden público. Artículo 1207 del Código Civil, 31 L.P.R.A. see. 3372. Véase además: S.L.G. Irizarry v. S.L.G. García, 155 D.P.R. 713 (2001); Trinidad v. Chade, 153 D.P.R 280 (2001); Luán Invest. Corp. v. Rexach Const. Co., 152 DPR 652 (2000).
Estas normas reconocen un doble postulado en la teoría general de los contratos; de un lado, la libertad en materia de contratación, y del otro, la total autonomía de la voluntad de los contratantes, que han escogido obligarse mutuamente para determinar el contenido de dicha relación jurídica, restringida únicamente por los límites que impongan la ley, la moral social y el orden público, como ya se dijo. Tan importante es la voluntad dual libremente expresada por medio del consentimiento libre e informado de ambos contratantes, que el Código Civil postula como axioma básico de la teoría general de la contratación que “la validez y [el] cumplimiento [del contrato así perfeccionado] no puede dejarse al arbitrio de una de las partes”, Artículo 1208 Código Civil, 31 L.P.R.A. see. 3373, ni está sujeto a la intromisión del Estado más allá de los límites antes señalados.
El Artículo 1214, 31 L.P.R.A. see. 3451, indica que “[e]l consentimiento se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato.” A tono con lo anterior, el consentimiento contractual se genera por la coincidencia de una oferta y su subsiguiente aceptación. Según lo dispuesto en el artículo antes citado, es necesaria la aceptación de una oferta para que un contrato quede perfeccionado. Garriga Hijo, Inc. v. Cond. Marbella del Caribe, 143 D.P.R. 927, 933 (1997); Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517 (1982).
En esencia, el proceso de negociación da inicio con la oferta, que constituye "...una proposición unilateral que una de las partes dirige a la otra para celebrar con ella un contrato. No es un acto preparatorio del contrato, sino una de las declaraciones contractuales. Así, pues, sólo hay oferta cuando el contrato puede quedar cerrado con la sola aceptación de la otra parte, sin necesidad de una ulterior declaración del que hizo la oferta." En otras palabras, habrá oferta: "...cuando en ella se contengan los elementos esenciales para la formación del contrato, de tal modo que no sea necesario para saber su contenido un nuevo acuerdo de las partes cuando se haya producido la aceptación." B. Moreno Quesada, La Oferta del Contrato, Barcelona, Colección Nereo, 1963, págs. 64-65.; Río Construction Corp. v. Municipio de Caguas, 155 DPR 394.
*755 Según los tratadistas Luis Diez-Picazo y Antonio Gullón, el concepto oferta puede ser definido como "... una declaración de voluntad emitida por una persona y dirigida a otra u otras, proponiendo la celebración de un determinado contrato”. Así, la oferta tiene que ser completa, de modo que el contrato quede perfeccionado con la mera aceptación. Por otro lado, la “aceptación es la declaración de voluntad que emite el destinatario de una oferta dando su conformidad a ella. ” Para que el contrato se entienda perfeccionado es menester que el destinatario de la oferta la acepte sin cambiar el contenido de ésta. Si el aceptante altera la oferta original, tal acción se toma como un rechazo de dicha oferta y a la vez se convierte en una contraoferta.
En palabras del tratadista Vélez Torres: “la aceptación en cambio debe ser pura y simple, pues si se le condiciona con limitaciones o cambios, no habrá tal, sino con rechazo de la oferta original y en su lugar una contraoferta”. Id. pág. 37. Véase además, L. Diez-Picazo, Fundamentos del Derecho Civil Patrimonial, Madrid, Ed. Tecnos, 1979, Vol. I, pág. 193; Lacruz Berdejo, Elementos de Derecho Civil, Barcelona, Ed. Bosch, 1977, T. II, Vol. 2, págs. 74-75; J. Castán Tobeñas, Derecho Civil Español, Común y Foral, lima ed., Madrid, Ed. Reus, 1974, T. III, pág. 533; E. Vázquez Bote, Derecho Civil en Puerto Rico, Barcelona, Ediciones Jurídicas, 1973, T. Ill, Vol. 1, págs. 481-482.
B
Por otro lado, es norma reiterada que mediante la moción de sentencia sumaria, regulada por la Regla 36 de las de Procedimiento Civil, 32 L.P.R.A. Ap. Ill, R. 36, un tribunal puede disponer de un caso sin celebrar vista en su fondo en aquellas situaciones en que la parte que la solicita demuestra que no existe controversia en cuanto a los hechos esenciales alegados en la demanda y que tan sólo resta disponer de las controversias de derecho existentes. PFZ Props., Inc. v. Gen. Acc. Ins. Co., 136 D.P.R. 881 (1994); Medina v. M.S. & D. Química P.R., Inc., 135 D.P.R. 716 (1994); Caquías v. Asoc. Res. Mansiones Río Piedras, 134 D.P.R. 181 (1993); Cuadrado Lugo v. Santiago Rodríguez, 126 D.P.R. 272 (1990).
El propósito de la sentencia sumaria es resolver justa, rápida y económicamente los pleitos, en los que, por no existir una controversia real de hechos, resulta innecesario celebrar un juicio en su fondo. González Pérez v. E.L.A., 138 D.P.R. 399 (1995); González v. Alicea, Dir. Soc. Asist. Legal, 132 D.P.R. 638 (1993); Mercado Vega v. U.P.R., 128 D.P.R. 273 (1991); Padín v. Rossi, 100 D.P.R. 259 (1971). “El sabio discernimiento es el principio rector para su uso porque, mal utilizada, [la sentencia sumaria] puede prestarse para despojar a un litigante de su ‘día en corte’, principio elemental del debido proceso de ley.” Roig Com. Bank v. Rosario Cirino, 126 D.P.R. 613, 617 (1990).
En este contexto, el tribunal debe analizar si existen o no controversias en cuanto a los hechos y que en derecho procede emitir sentencia a favor de la parte que la solicita. No cabe duda que un tribunal debe dictar sentencia sumaria a favor de la parte promovente si de los autos y de los documentos presentados en apoyo y oposición de dicha moción surge que no existe controversia alguna en cuanto a los hechos esenciales y que, como cuestión de derecho, procede que se dicte la misma a favor de dicha parte.
No obstante, como dicha determinación implica la adjudicación de un litigio sin que las paites tengan la oportunidad de presentar su caso ante el tribunal, la jurisprudencia ha concebido la sentencia sumaria como un remedio extraordinario que sólo debe ser concedido cuando el derecho del promovente surge con claridad. García v. Darex P.R., Inc., 148 D.P.R. 364 (1999). Además, se puede dictar cuando el promovente ha tenido una oportunidad adecuada de demostrar que el oponente no tiene derecho a que se emita sentencia a su favor como cuestión de derecho. M.J.C.A. v. Julio E., 124 D.P.R. 910 (1989); González Pérez v. E.L.A., supra; Flores v. Municipio de Caguas, 114 D.P.R. 521 (1983); Sucn. Meléndez v. D.A.C.O., 112 D.P.R. 86 (1982).
De otro lado, le corresponde a la parte promovida rebatir dicha moción por vía de declaraciones juradas u otra documentación que apoye su posición, pues si bien el no hacerlo necesariamente no significa que ha de emitirse el dictamen sumario automáticamente en su contra, tal omisión lo pone en riesgo de que ello ocurra. *756 Corp. of Presiding Bishop CJC of LDS v. Purcell, 117 DPR 714 (1987); Flores v. Municipio de Caguas, supra. Esto significa que toda duda sobre si un hecho fue controvertido debe resolverse a favor de la parte que se opone a la moción porque en esta etapa del procedimiento el tribunal no debe considerar la credibilidad de los documentos. La Regla 36.3 de Procedimiento Civil impone al juez que considera una solicitud de sentencia sumaria la obligación de considerar no sólo las declaraciones juradas sometidas para sustentarlas o las contradeclaraciones juradas de la otra parte, sino también “las alegaciones, [deposiciones], contestaciones a interrogatorios y admisiones ofrecidas”, amén de “todo documento admisible en evidencia” que obre en autos. Mgmt. Adm. Servs. Corp. v. E.L.A., 152 D.P.R. 599 (2000); Flores v. Municipio de Caguas, supra; Padín v. Rossi, supra.
Al tenor de la aludida obligación, el juzgador deberá analizar concienzudamente la moción de sentencia sumaria y su oposición, con sus respectivos anejos y el expediente en su totalidad, con el propósito de determinar si queda algún hecho material en controversia o si existen alegaciones afirmativas en la demanda presentada que no han sido refutadas. En cualquiera de dichos casos, de ello ser así, el tribunal deberá denegar la solicitud de sentencia sumaria. Cuadrado Lugo v. Santiago Rodríguez, supra; Corp. of Presiding Bishop CJC of LDS v. Purcell, supra. Una vez el tribunal tiene ante sí todos los documentos, debe analizar los hechos en la forma más favorable a la parte que se opone a que se dicte sentencia sumaria. Méndez Arocho v. El Vocero de P.R., 130 D.P.R. 867 (1992). La existencia de duda por parte del tribunal sobre la existencia o no de una controversia de hechos en el caso bajo su consideración, derrota la moción de sentencia sumaria. Corp. Presiding Bishop CJC of LDS v. Purcell, supra.
Así, “sólo procede dictar sentencia sumaria cuando surge claramente que el promovido por la moción no puede prevalecer bajo ningún supuesto de hechos y que el tribunal cuentja] con la verdad de todos los hechos necesarios para poder resolver la controversia. (Cita omitida). Cuando no existe una clara certeza sobre todos los hechos de la controversia, no procede una sentencia sumaria”. Mgmt. Adm. Servs. Corp. v. E.L.A., 152 D.P.R., pág. 610.
III
En su único señalamiento de error, las apelantes alegan que el TPI incidió al disponer del caso por el mecanismo sumario por entender que existen hechos materiales que están en controversia. Particularmente, señalan que la determinación del TPI de que “en momento alguno se formalizó acuerdo contractual alguno entre Lieberman y los demandantes [las apelantes]” no es un hecho incontrovertido. Plantean que del récord surge evidencia que establece una controversia en torno a si existió o no un contrato entre las partes. Sostienen tal postura en el contenido de la carta fechada 16 de septiembre de 2002 y los fragmentos de las deposiciones que unieron originalmente a su Oposición a la Moción Solicitando Desestimación. Argumentan, además, que el TPI erró al evaluar la credibilidad de los testimonios de los testigos, lo que resulta impropio al analizar la procedencia de una moción de sentencia sumaria. Por último, las apelantes arguyen que el TPI incidió al desestimar la demanda en contra del Sr. Lieberman tanto en su capacidad personal como oficial cuando dicho apelado defendió sus actuaciones como oficial corporativo únicamente y no las personales.
A los fines de atender los diferentes apuntamientos de las apelantes, precisa analizar primeramente las alegaciones de la demanda y los remedios solicitados al TPI.
En su demanda, las apelantes alegaron que llegaron a varios acuerdos con el Sr. Lieberman. El primero de ellos se describe como que "... éste pagaría en transacción $12,000 de los $41,896.87 adeudados hasta el 30 de junio de 2002 en rentas de Casatrón”. Otro de los alegados acuerdos fue "... que Casatrón y/o Tickets To Go continuarían el pago de la renta del edificio del mes de julio en adelante, ...”. Además, las apelantes adujeron que “[a] la luz de las representaciones del Sr. Lieberman, Lausell & Cario desistió sin perjuicio de la acción de desahucio contra Casatrón”, por lo que éste les era responsable.
*757 Con relación al Sr. Lieberman, las apelantes adujeron que “es deudor solidario hacia Lausell & Carlo, Inc. en lo que respecta a los $12,000 a los que se obligó mediante acuerdo extrajudicial para transigir la deuda pendiente de Casatrón a junio de 2002.” Agregaron que éste adeudaba $3,000 en honorarios de abogado por razón de los procedimientos de desahucio que “se detuvieron en (sic) base a (sic) la representación del Sr. Lieberman de que él compraría el equipo de Casatrón, y continuaría haciendo negocios y rentando el espacio comercial en el American Airlines Building bajo el nombre de Tickets To Go”. Por otro lado, las apelantes expusieron en la demanda que el Sr. Lieberman “no solo detuvo los procedimientos de desahucio a base de representaciones falsas, sino que ocasionó la extensión del subarrendamiento de Casatrón y/o Tickets To Go a base de representaciones con las que nunca cumplió y que constituyen pérdidas en rentas a Touchvision Realty Corp. ascendentes a $38,853.12.” 
Al tenor de tales alegaciones, las apelantes reclamaron de los apelados los siguientes remedios a saber:

“(1) el pago de $12,000 a Lausell & Cario, los que presuntamente se obligaron a satisfacer para transigir las rentas adeudadas por Casatrón a junio de 2002;

(2) el pago de $3,000 por concepto de honorarios de abogado como resultado de la suspensión del caso de desahucio;

(3) el pago de $38,853.12 a Touchvision por las rentas adeudadas desde agosto de 2002 a mayo de 2003, fecha hasta la cual Casatrón permaneció en el edificio; y

(4) el pago de $84,454.23 correspondiente a la deuda de Casatrón que el Sr. Lieberman se obligó a satisfacer en su carácter personal. ”

En su contestación a la demanda, los apelados negaron que Tickets To Go fuese sucesora de Casatrón y que hubiese alguna relación comercial entre ambas. Además, impugnaron la alegación de la demanda respecto a que el Sr. Lieberman era responsable en su capacidad personal. Se fundamentaron en el Artículo 12.04 de la Ley de Corporaciones, 14 L.P.R.A. see. 3129, que establece que los accionistas, directores y oficiales de la corporación no responden personalmente por las obligaciones de ésta. También adujeron que el Sr. Lieberman solicitó la posposición de los procedimientos de desahucio y no el desistimiento de la demanda incoada contra Casatrón.
Como defensas afirmativas, entre otras, alegaron que no tenía contrato alguno con las aquí apelantes y que nunca existió uno que los atara a éstas.
Hemos examinado minuciosamente la moción de sentencia sumaria presentada por los apelados conjuntamente con las deposiciones anejadas a ésta. También hemos analizado el alegato de oposición al recurso y la oposición a la moción de sentencia sumaria con sus correspondientes anejos.
De nuestro análisis se desprende que el caso podía ser resuelto por el mecanismo sumario debido a que no existen hechos medulares en controversia que requieran la celebración de una vista plenaria. La Moción de Desestimación presentada por los apelados contenía las deposiciones tomadas a los testigos claves de las apelantes al igual que al apelado Sr. Lieberman. Estas deposiciones, por ser testimonios tomados bajo juramento y con oportunidad de ser objeto de contrainterrogatorio, contienen garantías de confiabilidad. Se ha dicho que “[bjecause a deposition is taken under oath and the deponent’s responses are relatively spontaneous, it is one of the best forms of evidence for supporting or opposing a summary judgment motion”. 
Por otro lado, los testimonios de los aludidos testigos, coinciden en que no existió un contrato entre los apelados y las apelantes que los vinculara. En efecto, de nuestro examen se desprende que las partes sostuvieron *758 varias reuniones y conversaciones en las cuales se exploraron y mencionaron distintas alternativas para lidiar con las rentas adeudadas por Casatrón, pero en ninguna de ellas se llegó a un acuerdo concreto, sobre el precio a pagarse o el pietaje del local a ser arrendado que vinculara a las partes en un contrato. En consecuencia, somos de opinión que el TPI no erró al resolver que no existió contrato alguno entre las partes, que sustentara la responsabilidad de los apelados hacia las apelantes. Veamos.
El testigo Torres Otero declaró en su deposición que es contador público autorizado y uno de los socios de Lausell & Cario, corporación que se dedica a inversiones de propiedades inmuebles. Describió a Touchvision como la corporación que compró el edificio de American Airlines a Lausell & Cario. Se describió a sí mismo como asesor y consultor de Touchvision para convertir el edificio al régimen de propiedad horizontal.
El Sr. Torres Otero testificó ampliamente en su deposición en torno a las varias comunicaciones y conversaciones que sostuvo con el Sr. Lieberman. No obstante, aseveró que con el Sr. Lieberman no llegó a acuerdo alguno que lo vinculara con las apelantes. En particular-, el Sr. Torres Otero acotó:

“LCDA. LOPEZ GONZÁLEZ:

Entonces, usted adviene en conocimiento que a través de Touchvision ese espacio, -el que fuera-, no estaba pagando.

DEPONENTE:

No estaba pagando.

LCDA. LOPEZ GONZÁLEZ:

Y ahí es que usted nos relata que se pone en contacto nuevamente con el señor Lieberman.

DEPONENTE:

Correcto.

LCDA. LOPEZ GONZÁLEZ:

Y qué acordaron en esa conversación?

DEPONENTE:

Básicamente fue un acuerdo, -como decimos nosotros-, de ponerse de acuerdo, -y valga la redundancia-. El quería verme; nos íbamos a reunir e íbamos a llegar a un acuerdo.

LCDA. LOPEZ GONZÁLEZ:

¿Yse llegaron a reunir?

DEPONENTE:

En una reunión...no creo que nos reunimos más. Si conversamos en par de ocasiones adicionales, hablábamos de otros negocios y otras cosas, como siempre uno habla, -¿no?-, pero no nos pusimos de acuerdo y entonces ahí es que viene que tenemos que tomar la acción de demandar.

LCDA. LOPEZ GONZÁLEZ:

Así que durante esas próximas conversaciones nunca se llegó a concretar...

DEPONENTE:

Sí.

*759
LCDA. LOPEZ GONZÁLEZ:

...una reunion...

DEPONENTE:

Yo...

LCDA. LOPEZ GONZÁLEZ:

...entre ustedes.

DEPONENTE:

Es posible que hubiese reuniones, no me acuerdo. Yo sé que después del pleito en una ocasión nos reunimos muy cordialmente y conversamos. De hecho, conversamos, -porque él sigue aún interesado en estar en el edificio-, me dijo, “Mira, ya tú estás en la etapa que estás vendiendo este edificio por piso, a mí me interesaría. Hazme una oferta de un piso, a ver si podemos llegar a un acuerdo”. Yo le dije, “Mira vamos a hacer un negocio en el cual envolvamos a la...un acuerdo que lleguemos con la deuda y el costo del edificio y bregamos... ”, o sea, negociamos. Vamos a decir que hicimos un intento yo diría que sincero de ambas partes, vamos a decir, de negociar, pero no; no hubo contestación así.

LCDA. LOPEZ GONZÁLEZ:

No hubo respuesta a esa negociación de comprar el piso o un espacio.

DEPONENTE:

No hubo respuesta ni solución, -¿verdad?-...

LCDA. LOPEZ GONZÁLEZ:

Okay.

DEPONENTE:

...porque uno puede hablar y hablar, pero si no llega la cosa final, pues no llega. ” (Énfasis nuestro)
Por otro lado, el Ledo. Félix Román Carrasquillo (Ledo. Román) expresó que le hacía trabajos a una entidad llamada Interservice Group, por medio de la cual se le contrató para llevar unas acciones de desahucio y cobro de dinero. Testificó que dentro de esa relación compareció al tribunal por Lausell & Cario en un caso de desahucio. 
El Ledo. Román testificó que en las reuniones celebradas entre las partes, el Sr. Lieberman acordó que asumiría el contrato de arrendamiento [de Casatrón], pero no se acordó por cuánto, ni el precio, o el espacio a ocupar. Así, el Ledo. Román declaró:

“P ¿Quién es este señor?

R Casatrón, Constanzo.

P Casatrón. Okay.

R Le debía dinero a un montón de gente y la idea era- - el propósito de la reunión era ver cómo podía Eddie [Sr. Lieberman] asumir algún tipo de- - hacer lo que se llama la “quiebra criolla”. Que es que yo asumo tus deudas por menos y hablo con los acreedores y de un dólar que te debo, pues te pago los sesenta chavos el dólar u ochenta chavos el dólar. Y veo que puedo negociar con todo el mundo, pues entre lo que se estaba negociando, él estaba ayudando a Constanzo para hacer esto. Pues fue con nosotros que éramos los 
*760
arrendadores del local, o sea, del espacio, que éramos dueños.

P ¿Y qué se acordó en la reunión?

R Yo no sé qué exactamente, qué se concretó en la reunión. Yo sé que Eddie Lieberman se comprometió, no puedo decir, la verdad, que al frente mío, porque no recuerdo si lo hizo al frente en la reunión esa que tuvimos. Pero creo que posteriormente alguien de Lausell y Carlo me llama, y no sé si fue Tomás Torres o unas de las muchachas que asiste a Tomás, que Liberman va a pagar la renta.

La renta es mucho más de lo que Liberman iba a pagar, Liberman iba a asumir una parte de la renta y entonces, pues nosotros íbamos, obviamente a desistir de la solicitud del desahucio para que entonces se cuajara todo.

P Pero eso es una conversación suya posterior con alguien de Lausell y Cario, yo lo que le estoy- -

R No, es que- -

P ¿No recuerda tampoco ?

R Sí, porque es que no recuerdo. En la reunión que si se acordó- -

P O sea, pero propiamente en la reunión, ¿qué, si algo se concluyó, se acordó?

R Se que en la reunión se acordó que Eddie Liberman iba a hacerse cargo de los espacios, o sea, él iba a asumir el contrato de arrendamiento. Lo que no se acordó fue por cuánto, ni el precio, ni cómo era- - de cómo era. Mi mejor recuerdo es que sí que se acordó, “pues que está bien, pues yo voy a- -yo necesito el espacio porque yo voy a mover mis cosas”- -.

P O sea, ¿en esa reunión Liberman acordó asumir los espacios?

R Cuando digo asumir los espacios, se acordó si él iba a- -él quería empezar operaciones allí. Creó que también iba a- -él tenía varias corporaciones y no sé si las quería mover para allá. El acordó- -perdóneme, él acordó- -él no quería todo el espacio, él quería menos. Y por lo menos- -y él lo que quería era que nosotros le diéramos el “break" a este señor Constanzo, como quién dice, para negociar con él y darle un espacio menos, renegociar renta. Y entonces, pues damos un “lump sum”, equis, no sé cuánto era, por la deuda que debía Constanzo.

P Pero vamos con calma. Porque esto es bien, bien importante, licenciado.

R Okay.

P ¿Quéprecio se acordó por equis espacio del señor Liberman?

R No, no sé. No, allí que yo me acuerde, no puedo decirle que se acordó al frente mío ningún precio.

P ¿ Qué espacio o pie cuadrado acordó el señor Liberman que iba a- -

R Tampoco, allí ninguno. En específico, ninguno, porque esto estaba sujeto a negociarse.” [24] (Énfasis nuestro)

*761
Luego, el Ledo. Román fue más preciso, al testificar lo siguiente:

“P En esa reunión de las cuatro personas de Casatrón, Constanzo, Tomás Torres y usted, ¿ lo que se hicieron fue negociaciones de propuestas, pero no conclusiones concretas de equis espacio a equis precio ?

R No, allí no se- -no, eso no- -

P ¿Esto, se podría decir en el típico- -palabra común, esto es como un tanteo, o sea, yo me quedo con esto, si tú me das lo otro ? O sea, es como que yo te doy-

R Es unas negociaciones previas a, obviamente, la firma del contrato. Pero aquí no se llegó a nada específico como usted dice.

P ¿En esa reunión?

R En esa reunión concreto, de tanto más tanto, porque todavía estaba en el tapete lo principal de Liberman. Que Liberman dijo que iba a presentar una oferta de compra y venta del edificio completo. Y si él compraba el edificio, era académico negociar la renta que se debía.

P Por lo que yo puedo entender de esa reunión, esto fue un tanteo de negociación.

R Sí.

P ¿Pero no hubo una certeza de yo decir, “me voy a quedar con este espacio a un peso- -

R No, no hubo una- - Bueno, lo que pasa es que eso es una cuestión jurídica. Y si yo digo eso, pues obviamente no hay contrato y si no hay contrato, no hay contrato.

P No, no. Lo que quiero entender es si en ese momento no se concretó ningún contrato.

R No, ahí no se hizo ningún contrato, eso es correcto.

P Simplemente esto eran negociaciones.

R Negociaciones- - ”. 

El Ledo. Román precisó además:

“R Que ellos allá se entendían, exacto. Eso fue básicamente lo que pasó. Pero si le digo, mire, compañera, no hubo un contrato como tal, no hubo un acuerdo de tantos pies cuadrados, ni cuánto te voy a pagar. Pero sí hubo el “meeting of demise” [sic] que dice el americano, que dicen los tratadistas americanos, “meeting of demise" [sic] en cuanto a que Eddie Li[e]berman se iba a quedar con espacio allí, eso sí lo hubo. Y su compromiso de que él iba a pagar parte de la renta también lo hubo. Pero cuánto, porqué y cómo; no, porque estaba sujeto a lo de la compra del edificio.

O sea, que para efectos claros, si ese es el “issue” que usted dice y yo lo estoy entendiendo bien, no es porque- -

P No, hay par de “issues ” ahí, pero- -

*762
R No es que me estoy vendiendo con ellos ni mucho menos, como le dije aquí, me quedaron a deber chavo. No estoy aquí con ellos, ni le hago trabajos. O sea, yo vine aquí porque vengo a decir la verdad y como oficial de la corte.

P Claro, claro.

R Yo sí tengo que decir que Eddie Li[e]berman se comprometió a hacer un pago allí por equis- -por la renta que fuese- -

P ¿Sin cantidad?

R - - sin cantidad y a quedarse con espacio. Porque la idea era que él se quedara con espacio, porque nadie quiere tener un edificio vacío.

P ¿Sujeto a algo; condicionado a qué?

R Ala condición- -ellos allá negociando, quizás podemos- -como usted quiere atármelo a- -

P No, no, lo que le pregunto es si cuando se llegó a ese compromiso que él dijo- -tan preciso como lo está mencionando es que “sí, voy a coger un espacio, que sí me voy a hacer cargo”- -

R “Le voy a pagar al, pero ”- -

P ¿Pero condicionado a?

R Yo creo que la condición era de ponerse de acuerdo en cuanto a si iban a comprar el edificio o no. Y si Eddie iba a mover sus operaciones de Domino’s para acá.

P ¿Así que si él compraba el edificio o no- -

R Ah, no- -

P Entonces, esto era el acuerdo- -

R - -estamos especulando.

P - -sujeto a- - No, no, lo que quiero es estar clara para cuando se le vaya a manifestar esto al tribunal en algún momento, no quiero- -y más hacia un compañero abogado- -no quiero poner palabras o ideas que no sean las que usted nos está trasmitiendo. Y por eso es que quiero esta clara.

R Sí

P Sí hubo un compromiso que estaba sujeto a las negociaciones que ellos hicieron por allá, de cuando el señor Life]berman iba a- -

R Iba a comprar.

P - -hacer una oferta de comprar el edificio.

R Exacto. Quizás podemos- -yo sé que no se redactó un documento allí como tal. Porque yo sé que Tomás *763 [Sr. Torres Otero], conociéndolo en aquel momento- -y obviamente, un hombre de negocios, por lo que he oído por mi primo, no porque comparto con Tomás. Sí, yo se que Tomás le hubiese sacado contrato, “firma aquí, firma aquí y hazme el cheque”. Pero eso no fue lo que pasó, porque obviamente, había otras consideraciones. (Énfasis nuestro)
La deposición del Sr. Lieberman también resultó ser cónsona con lo testificado por el Sr. Torres Otero y el Ledo. Román. El apelado Lieberman declaró que:

“He-he [Sr. Torres Otero] made proposals to me. 1 didn’t make any proposals to him.... Uhhh ... but none of it made sense, because he was tying it to Domino’s and Domino’s wasn’t coming over, and if Domino’s isn’t coming on over here, then none of that made any sense to me.

[...]

I didn’t acknowledge or agree to any of his proposals, though”. 

Con ello, el Sr. Lieberman confirmó lo declarado por el Sr. Torres Otero en el sentido de que este último trató de que el Sr. Lieberman asumiera la deuda de Casatrón o adquiriera sus activos así como que trajera sus negocios al edificio como arrendatario.
De otro lado, el Sr. Lieberman testificó respecto a Casatrón lo siguiente:

“And then he’s telling me, well, you can] ft rent space for $60 a spot next door to the Health Center.

And I’m saying, what I am gonna do that for?- -The parking’s free where I am right now.

So all those things that he may have thought made sense for Domino’s Pizza, in my opinion, representing Domino’s Pizza, did not make any sense.

So that ended. Then we talked about Casatrón. And he says, well, here’s what they owe, and all this.

And I said, that’s a ridiculous amount of money; you’re not gonna get it.

[...]

We talked about, well, maybe Casatrón should reduce the size of the space. And then I said, uhhh, maybe that can be done. And then they proposed a lease, which was sent over to me, which I never utilized, signed, or responded to, because the lease was a moot issue at that particular point in time. And-[...]

A. Mr. Torres generated a lease, sent it over to me. I’m not sure if it represented for Domino’s and the other businesses, and Casatrón.

Again, he was still on the strategy that Domino’s should be moving over here, which I never gave him that commitment.

We talked about it, but never agreed on anything in terms of square footage, or floor space, or parking, or any of those things thereof.

It just dindn’t make any sense.

*764
And at the end of the day, if Joe wanted to keep Casatron afloat, he was on his own.

I did not own it, represent it.

There was an article in the newspaper that caused me a little bit of pain, that said that I had personally acquired Casatron.

I never would personally acquire a company with that much debt.

It was something that I didn’t consider.

Q. What about purchasing the assets?

A. No. There were no valuable assets for me to purchase from Casatron.

Q. Is that an idea that Mr. Tomás Torres and you discussed?-About how you could acquire Casatrón, the assets, and not the, the debts?

A. I didn ’t discuss that with him, from my recall. 
 (Énfasis nuestro)

El Sr. Lieberman también hizo claro en su deposición que el llegar a algún arreglo respecto a la deuda de Casatrón dependía de que se resolvieran las reclamaciones de los varios acreedores de dicha entidad. Asimismo, precisó que las mencionadas gestiones no tuvieron éxito.

Por su parte, las apelantes rebatieron la prueba antes descrita con una carta fechada 16 de septiembre de 2003 y fragmentos de las deposiciones del Sr. Torres Otero y el Ledo. Román.

En la carta de 16 de septiembre de 2002 dirigida al Sr. Lieberman, el Sr. Torres Otero expresó lo siguiente:

Dear Ed:

This is just a follow up from our recent conversation regarding the following:

1. We agree that you will pay using your new corporation $12,000 in settlement of this past due rent of $42,000 owned by Casatrón up to June 30, 2002.

2. That you will continue paying rent for the month of July and the on, based on the old contract. These amounts are past due.

3. We will sign a new lease agreement based on your present needs for the new operation.

Please call me on the status of each of these items.

Best Regards,

Tomás Torres Otero, CPA (Énfasis nuestro) 
En su deposición, el Sr. Torres Otero explicó que “habíamos conversado [con Lieberman] antes y conversamos después en varias ocasiones”. Acorde con ello, el deponente declaró lo siguiente respecto a la *765 citada comunicación escrita:

‘‘LCDA. LÓPEZ GONZÁLEZ:

Así que de estas primeras conversaciones [en] lo que terminan es [en] unos acuerdos, que usted se lo comunica en carta del 16 de septiembre de 2002, -que es en la carta que la licenciada también nos hizo llegar-,

(EL DEPONENTE REVISÓ EL DOCUMENTO FACILITADO POR LA LCDA. LÓPEZ GONZÁLEZ)

DEPONENTE:

Esta carta...es correcto. Esta carta es...

LCDA. LÓPEZ GONZÁLEZ:

Y esa es la carta a la cual usted estaba refiriendo de lo que concluyó las varias conversaciones con él.

DEPONENTE:

Sí. Esto es como un resumen de la ...de hecho, que nos reunimos...entre ese período en que él me escribe en julio 3 y esta fecha, nos reunimos él y yo en varias ocasiones, muchas veces telefónicamente, -en “Conference Call” y demás-, y llegamos a este acuerdo.

LCDA. LÓPEZ GONZÁLEZ:

¿Sería razonablemente justo decir que desde junio es que usted estuvo en conversación? Junio del 2002.

DEPONENTE:

Es posible que a final de junio fue que nos comunicamos y luego...

LCDA. LÓPEZ GONZÁLEZ:

Fue que empezaron las conversaciones.

DEPONENTE:

Sí. Sí. Con él directamente.

LCDA. LÓPEZ GONZÁLEZ:

Y ya para esta* fecha de septiembre...

DEPONENTE:

Ya aquí* nos habíamos reunido varias veces...

LCDA. LÓPEZ GONZÁLEZ:

Okay. ¿Ycuál es...

DEPONENTE:

...bien fuera telefónica o personalmente. ” [(Asterisco (*) en el original)]
Además de la referida carta, las apelantes se apoyaron en las páginas 33, 38, 44 y 51 de la deposición del Sr. Torres Otero.
Conforme a lo declarado por dicho testigo, el Sr. Lieberman le dijo que retirara la demanda de desahucio que las apelantes habían presentado en contra de Casatrón. No obstante, el Sr. Torres Otero también expresó que el Sr. Lieberman le indicó que pospusiera la vista de desahucio.
*766 Analizado dicho testimonio, determínanos que el mismo falla en establecer que el Sr. Lieberman hubiese asumido alguna obligación de pagar los honorarios de abogado por razón del “retiro” de la demanda de desahucio o la posposición de la vista de desahucio. Al contrario, lo que dicha declaración refleja es las varias conversaciones que sostuvieron el Sr. Lieberman y el Sr. Torres Otero, las cuales no llegaron a producir un acuerdo vinculante entre las partes. A iguales conclusiones se llega al examinar la página 44 de la deposición del Sr. Torres. La página 51 de la deposición del Sr. Torres Otero tampoco sostiene el hecho de que las partes hubiesen llegado a algún acuerdo vinculante.
Las apelantes también utilizaron como fundamento para controvertir la moción de sentencia sumaria las páginas 56, 57 y 83 de la deposición tomada al Lie. Román. Aunque dicho testigo mencionó una reunión en la que “... se acordó que Eddie Lieberman iba a hacerse cargo de los espacios, o sea, él iba a asumir el contrato de arrendamiento”, también éste aclaró que “[l]o que no se acordó fue por cuánto, ni el precio, ni cómo era - - de cómo era....'”. Más adelante, en la pág. 57 de su deposición, el Ledo. Román explicó que el Sr. Lieberman “... lo que quería era que nosotros le diéramos el “break” a este señor Constanzo, como quien dice, para negociar con él y darle un espacio menor, renegociar renta. Y entonces, pues damos un “lump sum” equis, no sé cuánto era, por la deuda que debía Constanzo”. 
Finalmente, con relación a la página 83, el Ledo. Román explicó que “... [d]e que sí, hubo un compromiso de ambos, de que ‘mira, mano da y mano da, vamos a echar esto para adelante ’. Cuánto es y cómo es y qué espacio es lo que voy a coger, pues eso estaba sujeto después a negociarse ”. (Énfasis nuestro)
Conforme a lo expuesto, determinamos que el TPI no cometió el error imputado. Somos del criterio de que las deposiciones sometidas por los apelados con la moción dispositiva son consistentes entre sí en acreditar el hecho de que “en momento alguno se formalizó acuerdo contractual alguno” entre las partes para que el Sr. Lieberman o Tickets to Go, Inc. asumiera la renta, los atrasos de Casatrón o para ocupar el local arrendado por éste. Además, concluimos que tales testimonios coinciden en que las conversaciones sostenidas por las paites se limitaron a la celebración de negociaciones futuras y que tales conversaciones no dieron resultados y por ende, no se dieron los elementos necesarios que configurara una propuesta completa de parte de los apelados hacia las apelantes para celebrar un contrato, o dicho de otro modo, no hubo conversaciones entre las partes con la suficiente concreción para que con la sola aceptación de las apelantes naciera un contrato que vinculara a las partes.
Por último, las apelantes le imputan al TPI haber errado al desestimar la demanda en contra del Sr. Lieberman en su capacidad personal cuando éste esbozó su defensa únicamente como oficial corporativo de Tickets To Go.
El Artículo 12.04 de la Ley de Corporaciones dispone en su parte pertinente que:

“(a)...

(b) No se entablará pleito alguno contra ningún oficial, director o accionista por deuda u obligación de la corporación de la cual es oficial, director o accionista, hasta que se dicte sentencia final en contra de la corporación, y que la ejecución de la misma permanezca insatisfecha, ni después de tres (3) años a partir de la fecha de tal sentencia, y cualquier oficial, director o accionista podrá levantar cualquier defensa que la corporación hubiere podido levantar contra tal deuda u obligación. Este inciso (b) no aplicará a los pleitos que se entablen contra oficiales o directores de una corporación que estén en proceso de disolución por mal administración en el ejercicio de sus funciones con arreglo a las sees. 3001 a 3015 de este título. ” 14 L.P.R.A. See. 3129.
De otro lado, se ha dicho que “[e]n el aspecto contractual, cuando un oficial u otro funcionario contrata *767 con un tercero a nombre de una corporación, la imposición de responsabilidad deberá examinarse bajo las normas del contrato de mandato o comisión. Como resultado de estas normas, el funcionario no responderá personalmente de la prestación objeto del contrato, en la medida que el tercero tuviera conocimiento de su gestión a nombre de la corporación.” 
No encontramos en el expediente o en las comparecencias de las apelantes alguna prueba que nos permita inferir que el Sr. Lieberman pudiera ser responsable en su capacidad personal por los hechos alegados en la demanda incoada en su contra por las apelantes. En efecto, al tenor de la prueba sometida al TPI con la moción de sentencia sumaria, el Sr. Lieberman no quedó obligado hacia las apelantes en su carácter corporativo. Nuestro análisis de dicha prueba también nos lleva a concluir que tampoco el aludido apelado se obligó en su carácter personal. Por ende, dicho planteamiento de las apelantes carece de mérito.
IV
Por los fundamentos expuestos, se confirma la sentencia emitida por el TPI el 22 de diciembre de 2005 y notificada el subsiguiente día 29.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2008 DTA 18
1. Apéndice del recurso, pág. 46.
2. Apéndice del recurso, pág. 46.
3. Recurso, pág. 2.
4. José Ramón Vélez Torres, Curso de Derecho Civil, T. IV, V. II, Derecho de Contratos, 1990, pág. 37.
5. J. Puig Brutau, Fundamentos de Derecho Civil, 3ra ed., Barcelona, Ed. Bosch, 1988, T. II, Vol. I, pág. 172.
6. Luis Diez-Picazo y Antonio Gullón, Sistema de Derecho Civil, V. II, 1994, pág. 69,
7. Puig Brutau, op.cit, pág. 214
8. Diez-Picazo y Gullón, Ob. Cit, pág. 71.
9. Vélez Torres, Op cit, pág. 38.
10. Id. en la página 37.
11. Apéndice del recurso, pág. 2.
12. Id.
13. Apéndice del recurso, pág. 2.
14. Apéndice del recurso, pág. 3.
15. Apéndice del recurso, pág. 3.
*768 16. Apéndice del recurso, págs. 3-4.
17. Wight-Miller-Kane, Federal Practice and Procedure, Vol. 10A, See. 2722.
18. Apéndice de los apelados, págs". 15-16.
19. La totalidad de la deposición del Sr. Torres Otero como las del Ledo. Román y el Sr. Lieberman fueron incluidas por los apelados en su Apéndice.
20. Apéndice de los apelados, págs. 73-75.
21. Apéndice de los apelados, págs. 247-248.
22. Apéndice de los apelados, pág. 249.
23. Id, pág. 251.
24. Apéndice de los apelados, págs. 285-288.
25. Apéndice de los apelados, págs. 289-290. Véase además pág. 292 de dicho Apéndice.
26. Apéndice de los apelados, pág. 300-302.
27. Apéndice de los apelados, págs. 177-178. Surge de la deposición que el Sr. Lieberman era el principal de Dominos Pizza.
28. Apéndice de los apelados, págs. 174-176.
29. Apéndice de las apelantes, pág. 34.
30. Apéndice de los apelados, pág. 49.
31. Apéndice de los apelados, págs. 49-50.
32. Apéndice de las apelantes, págs. 39-42.
33. Apéndice de las apelantes, págs. 35-37.
34. Apéndice de las apelantes, pág. 36.
35. Id, pág. 36.
36. Apéndice de los apelados, pág. 313.
37. Carlos E. Díaz Olivo, Corporaciones, Publicaciones Puertorriqueñas, 1999, págs. 97 y 98.